<pre>
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE SOUTHERN DISTRICT OF TEXAS

 3                            HOUSTON DIVISION

 4   UNITED STATES OF AMERICA       §      CASE NO. 4:24-CR-00543-7
                                    §      HOUSTON, TEXAS
 5   VERSUS                         §      THURSDAY,
                                    §      MARCH 6, 2025
 6   ROY GOMEZ                      §      9:00 A.M. TO 11:23 A.M.

 7
                               DETENTION HEARING
 8
                    BEFORE THE HONORABLE YVONNE Y. HO
 9                    UNITED STATES MAGISTRATE JUDGE

10

11        APPEARANCES:                   SEE NEXT PAGE
          CASE MANAGER:                  RACHEL WILLBORG
12        COURT RECORDER:                STACY THOMAS

13

14   THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC EXPENSE UNDER
     THE CRIMINAL JUSTICE ACT AND MAY BE USED ONLY AS AUTHORIZED
15   BY COURT ORDER.   UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
     ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN ORIGINAL AND
16   ONE COPY AT THE OFFICIAL RATE.   General Order 94-15, United
     States Court, Southern District of Texas.

17

18                         (AUDIO ISSUES NOTED)

19

20                      TRANSCRIPTION SERVICE BY:

21               JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                       935 Eldridge Road, #144
22                      Sugar Land, TX 77478
                           281-277-5325
23                   www.judicialtranscribers.com

24
          Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.
</pre>

1                          **APPEARANCES:**

2

3    FOR THE PLAINTIFF:              U.S. ATTORNEY'S OFFICE
                                     Kelly Zenon-Matos
4                                    Byron Black
                                     1000 Louisiana St., Ste. 2300
5                                    Houston, TX  77002
                                     1-713-567-9000
6

7
     FOR DEFENDANT GOMEZ:            ATTORNEY AT LAW
8                                    David Adler
                                     1415 N. Loop West, Ste. 905
9                                    Houston, TX  77008
                                     1-713-666-7576
10

11
     FOR DEFENDANT SANCHEZ:          ATTORNEY AT LAW
12                                   James Ray Alston
                                     1415 N. Loop West, Suite 905
13                                   Houston, TX  77008
                                     1-713-228-1400
14

15
     FOR DEFENDANT MCCABE:           ATTORNEY AT LAW
16                                   Brian Roberts
                                     116 S. Avenue C
17                                   Humble, TX  77338
                                     1-713-237-888
18

19

20

21

22

23

24

25

3

**INDEX**

| WITNESS: | Direct | Cross | Redirect | Recross |
|----------|--------|-------|----------|---------|

GOVERNMENT'S:

JOSHUA LYONS

| | Direct | Cross | Redirect | Recross |
|---|--------|-------|----------|---------|
| By Ms. Zenon-Matos | 8 | . | . | . |
| By Mr. Black | 31 | . | . | . |
| By Mr. Adler | . | 62 | . | . |
| By Mr. Alston | . | 76 | . | . |
| By Mr. Roberts | . | 95 | . | . |

| EXHIBITS: | Marked | Offered | Received |
|-----------|--------|---------|----------|

GOVERNMENT'S:

| | Marked | Offered | Received |
|---|--------|---------|----------|
| Exhibit 1 | | 16 | 16 |
| Exhibit 4 | | 23 | 23 |
| Exhibit 5 | | 26 | 26 |
| Exhibit 6 | | 26 | 26 |
| Exhibit 7 | | 26 | 26 |
| Exhibit 8 | | 26 | 26 |
| Exhibit 9 | | 28 | 28 |
| Exhibit 10 | | 28 | 28 |
| Exhibit 11 | | 28 | 28 |
| Exhibit 12 | | 28 | 28 |
| Exhibit 13 | | 28 | 28 |
| Exhibit 14 | | 28 | 28 |
| Exhibit 15 | | 28 | 28 |
| Exhibit 101 | | 33 | 33 |
| Exhibit 103 | | 35 | 35 |
| Exhibit 114 | | 44 | 44 |
| Exhibit 115 | | 49 | 49 |
| Exhibit 116 | | 49 | 49 |
| Exhibit 117 | | 49 | 49 |
| Exhibit 118 | | 49 | 49 |
| Exhibit 119 | | 49 | 49 |
| Exhibit 120 | | 49 | 49 |
| Exhibit 121 | | 49 | 49 |
| Exhibit 122 | | 49 | 49 |
| Exhibit 123 | | 49 | 49 |
| Exhibit 124 | | 49 | 49 |
| Exhibit 125 | | 49 | 49 |
| Exhibit 126 | | 49 | 49 |

1                           **INDEX (CONT'D)**

2

3     EXHIBITS:                          Marked    Offered    Received

4     GOVERNMENT'S:

| | Marked | Offered | Received |
|---|---|---|---|
| 5   Exhibit 127 | | 49 | 49 |
|     Exhibit 128 | | 49 | 49 |
| 6   Exhibit 129 | | 49 | 49 |
|     Exhibit 130 | | 49 | 49 |
| 7   Exhibit 131 | | 49 | 49 |
|     Exhibit 132 | | 49 | 49 |
| 8   Exhibit 133 | | 49 | 49 |
|     Exhibit 134 | | 49 | 49 |
| 9   Exhibit 135 | | 49 | 49 |
|     Exhibit 136 | | 49 | 49 |
| 10  Exhibit 137 | | 49 | 49 |
|     Exhibit 138 | | 49 | 49 |
| 11  Exhibit 139 | | 49 | 49 |
|     Exhibit 140 | | 49 | 49 |
| 12  Exhibit 141 | | 49 | 49 |
|     Exhibit 142 | | 49 | 49 |
| 13  Exhibit 143 | | 49 | 49 |
|     Exhibit 144 | | 49 | 49 |
| 14  Exhibit 145 | | 49 | 49 |
|     Exhibit 146 | | 49 | 49 |
| 15  Exhibit 147 | | 49 | 49 |
|     Exhibit 162 | | 56 | 56 |
| 16  Exhibit 163 | | 56 | 56 |
|     Exhibit 164 | | 56 | 56 |
| 17  Exhibit 165 | | 56 | 56 |
|     Exhibit 166 | | 56 | 56 |
| 18  Exhibit 167 | | 56 | 56 |
|     Exhibit 168 | | 56 | 56 |
| 19  Exhibit 169 | | 56 | 56 |
|     Exhibit 170 | | 56 | 56 |
| 20  Exhibit 171 | | 56 | 56 |
|     Exhibit 172 | | 56 | 56 |
| 21  Exhibit 173 | | 56 | 56 |
|     Exhibit 174 | | 56 | 56 |
| 22  Exhibit 175 | | 56 | 56 |
|     Exhibit 176 | | 56 | 56 |
| 23  Exhibit 177 | | 56 | 56 |
|     Exhibit 178 | | 56 | 56 |
| 24  Exhibit 179 | | 56 | 56 |
|     Exhibit 180 | | 56 | 56 |
| 25  Exhibit 181 | | 56 | 56 |

1                         **INDEX (CONT'D)**

2

3   EXHIBITS (Continued):           Marked    Offered    Received

4   GOVERNMENT'S:

5   Exhibit 182                               56         56
    Exhibit 183                               56         56
6   Exhibit 184                               56         56
    Exhibit 185                               56         56
7   Exhibit 186                               56         56
    Exhibit 187                               56         56
8   Exhibit 188                               56         56
    Exhibit 189                               56         56
9   Exhibit 190                               56         56
    Exhibit 191                               56         56
10  Exhibit 192                               56         56
    Exhibit 193                               56         56

11

12  DEFENDANT GOMEZ'S:
    Exhibit 1                                 71          .

13

14

15                          ***

16

17

18

19

20

21

22

23

24

25

6

1          **HOUSTON, TEXAS; THURSDAY, MARCH 6, 2025; 9:00 A.M.**

2          THE COURT:  Calling Case 4:24-cr-543, United

3    States versus Roy Gomez, Christopher Sanchez, and Ronnie

4    McCabe.  Let's take appearances.  For appears -- who is here

5    for the United States?

6          MS. ZENON-MATOS:  Yes, Your Honor.  Kelly Zenon on

7    behalf of the United States.

8          MR. BLACK:  And Byron Black for the Government.

9          THE COURT:  Good morning both of you.

10          All right.  Who is here for Mr. Gomez?

11          MR. ADLER:  David Adler for Mr. Gomez, who's

12    present in the courtroom this morning.

13          THE COURT:  Good -- I'm sorry, I'm getting warrant

14    calls.  Turn off the ringer.  Okay.

15          Let's see, and then for Mr. Sanchez.

16          MR. ALSTON:  James Alston, Your Honor.

17          THE COURT:  Good morning to you.

18          And for Mr. McCabe.

19          MR. ROBERTS:  Good morning, Judge.  Brian Roberts

20    for Mr. McCabe.

21          THE COURT:  All right.  We have a detention

22    hearing scheduled for Messrs. Gomez, Sanchez, and McCabe; is

23    that correct?

24      (Attorneys respond in the affirmative in unison.)

25          THE COURT:  Okay.  Are the parties ready to

1    proceed?

2            MS. ZENON-MATOS:  Yes, Your Honor.

3            MR. SPEAKER:  Yes, Your Honor.

4            THE COURT:  Okay.  Please take a seat.

5            Procedurally, I'm going to tell folks that some of

6    these hearings have ended up sounding like they were main

7    trials.  And they're not supposed to be so I'm putting

8    everybody on the clock.

9            So, Government, I know that there are three

10   Defendants.  You need to focus on facts specific to these

11   individuals.  Don't give me the whole history and genesis of

12   the Bandidos.

13           And I'll give you an hour.  I'm -- and I have a

14   timer so --

15           MS. ZENON-MATOS:  Your Honor, in this case

16   originally the hearing for Mr. Sanchez (indiscernible) for

17   acts that do not include the other two Defendants

18   originally.  As per the (indiscernible) separately is fine.

19           What we're going to do is that, I'm going to cover

20   very briefly the generals, just because it's important for

21   argument, and Mr. Sanchez.  And then I'm going to pass it to

22   counsel and he's going to cover the other acts just --

23           THE COURT:  That's fine.

24           MS. ZENON-MATOS:  That's the way we're going to do

25   it.

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                    8

1              THE COURT:  That's fine.  But I'm giving you a

2    total of an hour.

3              MS. ZENON-MATOS:  Yeah.  Okay.

4              THE COURT:  You can do it.  I gave Mr. Black,

5    what, 40 minutes yesterday and he used 23, so it can be

6    done.

7              MS. ZENON-MATOS:  We're going to go really, really

8    fast.

9              THE COURT:  Okay.  You may call your first

10   witness.

11             MS. ZENON-MATOS:  Yes, Your Honor.  In this case

12   we're calling TFO Joshua Lyons.

13        (Pause)

14          JOSHUA LYONS, GOVERNMENT'S WITNESS, SWORN

15             MS. ZENON-MATOS:  Good morning, sir.

16                      DIRECT EXAMINATION

17   BY MS. ZENON-MATOS:

18   Q    Can you please state your full name for the record?

19   A    Joshua Lyons.

20   Q    What is your occupation?

21   A    State police lieutenant, task force officer to the FBI

22   Houston Safe Streets Task Force.

23   Q    Since when?

24   A    With police, 2007; with the task force since 2010.

25   Q    Okay.  Let's go directly to the matter.  Are you

1    familiar with an organization by the name of the Bandidos

2    Outlaw Motorcycle Gang?

3    A    Yes, ma'am.

4    Q    And why is that?

5    A    We've been investigating them for approximately six

6    years.

7    Q    Okay.  Have you been able to interview witnesses and

8    cooperating witnesses that have provided information to you

9    in regards to the operations of this organization?

10   A    Yes, ma'am.

11   Q    Okay.  In very general terms since we're going to get

12   right to the participation of Mr. Sanchez, but who are the

13   Bandidos Outlaw Motorcycle Gang?

14   A    It is a one percent outlaw motorcycle gang,

15   paramilitary in structure, operates under a set of bylaws

16   created in Texas.  Predominantly Texas is their home base,

17   though they spread across the United States and the world.

18   Q    Okay.  And do the Bandidos members identify themselves

19   in any way?

20   A    Yes, ma'am, various.  Of course the cuts and the red

21   and gold colors that they wear, clothing, jewelry, tattoos.

22   Q    What does the one percent mean?

23   A    The one percent is really stemmed from a quote back

24   when motorcycle clubs started and there was some trouble

25   breaking out, that the American Motorcycle Association

1   claimed that 99 percent of motorcycle riders are law-abiding

2   citizen and it's the one percent that are the problems, or

3   the outlaws.

4   Q     Okay.  And they are the one percent.

5   A     Once that statement was made, they kind of took and

6   created a one percent diamond for their various clubs as a

7   badge of honor that we're outlaws.

8   Q     Okay.  Are you aware of an indictment against the

9   members of the Bandidos Outlaw Motorcycle Gang that was

10  returned by the grand jury on February 11th --

11  A     Yes.

12  Q     -- of 2025?

13  A     Yes, ma'am.

14  Q     Are you aware of the charge?

15  A     Yes, ma'am.

16  Q     Did you or any member of your unit participate in this

17  investigation that led to those charges?

18  A     Yes, ma'am.

19  Q     According to your investigation, in very general terms

20  again, what activities, criminal activities the Bandidos are

21  engaged in?

22  A     As seen in the indictment and other federal, state

23  investigations, murder, attempted murder, aggravated

24  robbery, aggravated assault, narcotics trafficking, firearms

25  trafficking, arson, witness intimidation, to name a few.

1  Q    According to your investigation, how is that you gain

2  membership into the Bandidos?

3  A    You usually have to hang around for a while, kind of an

4  official hang around status, or be a member of a support

5  club, which is an officially sanctioned support club that

6  the Bandidos create to kind of up their numbers.

7        And then once you've kind of proven yourself, that you

8  can be trusted, you're invited to become a prospective

9  member or a prospect that you do for six months.  Then

10  you're voted in to become a member.

11  Q    And let's talk about the (indiscernible) of the

12  Bandidos very briefly.  How are the Bandidos organized here

13  in Texas?

14  A    Again, here in Texas, but like here in the Houston area

15  there's anywhere usually between 11 and 17 chapters.  The

16  chapters have rank.  Usually, again, starting from the hang

17  around status, official hang around, prospect, and then you

18  become a full member.

19        And then from full member various ranks in the chapter:

20  sergeant at arms, road captain, secretary, treasurer, vice

21  president, and then chapter president.

22  Q    Okay.  And how does a Bandido member becomes, for

23  example, president or vice president of a Bandidos chapter?

24  A    It's basically a chapter rank is usually voted on by

25  members of the chapter or, depending on the lower rank, a

1  chapter president can appoint his sergeants and secretary,

2  treasurer.

3       To become a chapter president that's can be the vote of

4  the chapter or a national sergeant at arms or a national

5  officer over the area can appoint them.

6  Q    Are you aware of a chapter here in the Houston area by

7  the name of Splendora?

8  A    Yes, ma'am.

9  Q    Okay.  Where is that chapter specifically located?

10 A    In the Splendora area but kind of encompassing that

11 area of Montgomery County, Texas.

12 Q    Got you.  Finally, are the Bandidos associated or --

13 strike that.

14      During the period of your investigation, were the

15 Bandidos at war with any other motorcycle club?

16 A    Yes, ma'am.  Throughout our investigation they've been

17 at war with the Mongols, Kinfolk, Brothers East, and allies,

18 to include Wheels of Soul, Chosen Few, and as well as the

19 Homietos.

20 Q    Okay.  And that happened during this period of your

21 investigation.

22 A    Yes, ma'am.

23 Q    Let's go specifically to Defendant Christopher Sanchez.

24 As part of your investigation did you familiarize with an

25 individual by the name of Christopher Sanchez?

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                    13

1   A    Yes, ma'am.

2   Q    Who is that individual you can identify him in the

3   courtroom today?

4   A    Oh, there he is.  This gentleman right there, tattoos.

5   Q    Okay.  Does, according to your investigation, this

6   individual have an alias?

7   A    Yes, ma'am.

8   Q    What is it?

9   A    Goes by "Monster."

10  Q    "Monster."  According to your investigation was

11  Defendant Sanchez a member of the Bandidos during the period

12  that your investigation covered?

13  A    Yes, ma'am.

14  Q    Okay.  When did he become a member of the Bandidos,

15  according to your investigation?

16  A    We were able to recover his application.  I believe it

17  was 2022.

18  Q    Okay.  What was his role in the hierarchy of the

19  Bandidos that you previously described during the period

20  that you investigated?

21  A    Started out as a prospect and then earned his way in,

22  and then up to the latest of when our enforcement action was

23  just taken, chapter vice president of the Splendora chapter.

24  Q    Okay.  And that was the highest position he reached.

25  A    Yes, ma'am, I believe so.

1   Q    Vice president, okay.  According to your investigation,

2   in addition to his participation with the Bandidos Outlaw

3   Motorcycle Gang, Christopher Sanchez had any other

4   occupation?

5   A    He was a tattoo artist.

6   Q    Okay.  Where did he work?

7   A    He actually created his -- I believe he created it or

8   was the owner of Monsters Ink off 1488 in Conroe, Montgomery

9   County.

10  Q    Was it tattoo parlor room?

11  A    Tattoo parlor, yes, ma'am.

12  Q    Okay.  And he owned this establishment.

13  A    I believe that he was the owner, yes, ma'am.

14  Q    Okay.  Let's talk about briefly about this location.

15  During the period of your investigation, and based on

16  information you received, were there any illegal activities

17  being conducted in his tattoo parlor room that belonged to

18  Mr. Sanchez?

19  A    Yes, ma'am.

20  Q    Can you please describe that to the Court?

21  A    Well, we had had some surveillance -- well, we had one

22  particular surveillance operation out there that we were

23  able to observe Mr. Sanchez, you know, hosting a large

24  gathering there, around a hundred people, to include many

25  Bandidos.

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                    15

 1          And we were able to photograph Mr. Sanchez with a

 2   firearm on his hip, which he, being a convicted felon, is

 3   not allowed to possess.  But he had a firearm on his hip.

 4          And then some reporting from witnesses about firearms

 5   inside the tattoo studio, as well as marijuana usage and

 6   selling.

 7   Q    Okay.  According to your investigation, were any

 8   members of the Bandidos were -- served in that location or

 9   visited that location according to information you received?

10   A    Yes, ma'am.

11   Q    Okay.  You mentioned just a minute ago surveillance

12   that was conducted by your unit in order to corroborate

13   information in regards to firearm and drug use.  Was that

14   surveillance conducted on September 24th, 2022?

15   A    Yes, ma'am.

16   Q    Okay.  And you mentioned during that surveillance that

17   Mr. Sanchez was observed in the possession of a firearm.

18   A    Yes, ma'am.

19   Q    Okay.  And you mentioned that according to your

20   investigation at that time, Mr. Sanchez was a convicted

21   felon, or is still today.

22   A    Yes, ma'am.

23   Q    Okay.  Were there any photographs taken during that

24   surveillance?

25   A    Yes, ma'am.

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS          16

1  Q    Okay.  If you were able to see one of those images that

2  was taken from Mr. Sanchez during that surveillance,

3  September 24, 2022, would you be able to recognize it?

4  A    Yes, ma'am.

5          MS. ZENON-MATOS:  Your Honor, we had previously

6  provided all the exhibits to counsel, so we are going to be

7  making reference to Exhibit Number 1.

8          THE COURT:  Exhibit Number 1?

9          MS. ZENON-MATOS:  Yes.

10          THE COURT:  I don't have a one.  They start at

11  101.

12          MS. ZENON-MATOS:  It's our mistake.  We have it

13  now.

14          MR. BLACK:  It will (indiscernible).

15          THE COURT:  Oh, okay.

16          MS. ZENON-MATOS:  Your Honor, so we can speed up

17  the process, we just want to double-check if there are any

18  objections by Mr. Sanchez in regards to the admission of

19  that exhibit.

20          THE COURT:  Counsel.

21          MR. ALSTON:  No objection, Your Honor.

22          THE COURT:  All right.  Government's Exhibit 1 is

23  admitted for --

24          MS. ZENON-MATOS:  Okay.

25          THE COURT:  -- today's hearing.

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                    17

1        (Government's Exhibit Number 1 received in evidence.)

2            MS. ZENON-MATOS:  Thank you, Your Honor.

3   BY MS. ZENON-MATOS:

4   Q    Publishing Exhibit Number 1, are you seeing that

5   exhibit, witness, Mr. Lyons?

6   A    Yes, ma'am.

7   Q    Okay.  What is reflected in that exhibit?

8   A    Mr. Sanchez wearing his Bandidos cut in the parking lot

9   of the tattoo parlor, and a revolver in a holster on his

10  right hip.

11  Q    Okay.  And at the time he was a convicted felon.

12  A    Yes, ma'am.

13            MS. ZENON-MATOS:  And you confirmed that that

14  surveillance took place on September the 24th, 2022.

15  Q    In addition to that photograph that you obtained

16  showing that Mr. Sanchez was possessing a firearm, did you

17  obtain any social media videos or any cellphone videos also

18  depicting Mr. Sanchez with a firearm around that same time?

19  A    Yes, ma'am.

20  Q    Can you describe the video that you obtained?

21  A    Yes, ma'am.  It was almost like a thank you video that

22  Mr. Sanchez did I believe with two female employees where

23  they were thanking the individuals for coming out, you know,

24  helping them open the tattoo studio.

25        And he was sitting down, looks like behind a desk or a

1  table.  And as he stood up as the video was ending, you see

2  the same pistol on his hip.

3  Q    And according to your investigation that video was

4  recorded around the same time, September 24, 2022.

5  A    I believe it was either that -- I believe it was night.

6  It might have been posted the next day.

7          MS. ZENON-MATOS:  Okay.  Your Honor, we're going

8  to be playing what has been marked as Exhibit Number 2.  It

9  is a very short video.

10         THE COURT:  I'm sorry, before you play it,

11  Mr. Alston, any objections to Exhibit 2?  Have you seen this

12  one?

13         MR. ALSTON:  I have no objections, Your Honor.

14         THE COURT:  Okay.  All right.  Go ahead.  Sorry.

15      (Government's Exhibit Number 2 played from 9:14 a.m. to

16  9:15 a.m.)

17  BY MS. ZENON-MATOS:

18  Q    Can you describe what we just saw and heard on that

19  video and what we are seeing?  We just paused the video at

20  eight seconds there.

21  A    It was just Mr. Sanchez thanking people for coming out.

22  And you could see the same holster.  And from the image,

23  depending on how it was filmed, it's flipped.  So that -- it

24  looks like the left but -- the left hip but it's really the

25  right hip.

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                    19

1   Q    And what are we seeing there in that image?

2   A    A revolver in a holster.

3   Q    Okay.  And that was in September of 2022.  Let's jump a

4   few months after.  And I'm now taking you to February the

5   2nd, 2023, specifically to the Bimboz Bar.  Very briefly can

6   you please relate to the Court what happened there at

7   Bimboz?

8   A    The Bandidos were holding a regional card game, which

9   was approximately 17 chapters at the time attended this

10  meeting.

11      And the Gray Beards Motorcycle Club, which is known not

12  as an official support club but a friendly club to the

13  Bandidos, was told to arrive.

14      The Bandidos had an issue with them because they had

15  heard a rumor that the Gray Beards had made like a separate

16  peace agreement with Beast, their primary rival.

17      The Gray Beards were fronted about that, and they were

18  jumped and assaulted, and their cuts were taken from them.

19  And inside their cuts they had their wallets and money and

20  phones and keys and various items.  And many of them had to

21  get medical treatment afterwards.

22  Q    According to your investigation, was Mr. Christopher

23  Sanchez present at Bimboz?

24  A    Yes, ma'am.

25  Q    And how did you corroborate that?

1    A    We had victims identify him as being there and wearing

2    a  mask.

3         And then we were able to find him coming from where the

4    assault was taking place, one of the last individuals to

5    leave that place, wearing the same red masks that the

6    victims told us.

7         We did a cell tower dump.  We have his phone there,

8    so --

9    Q    Okay.  And was there video evidence --

10   A    Yes, ma'am.

11   Q    -- where it depicts also Mr. Sanchez in the specific

12   area where this occurred?

13   A    Yes, ma'am.

14   Q    And did you receive testimonial evidence identifying

15   Mr. Sanchez as part of the group of individuals that

16   committed the assault?

17   A    Yes, ma'am.

18           MS. ZENON-MATOS:  Okay.  Your Honor, we are going

19   to jump Exhibit Number 3 because it's going to be presented

20   by brother counsel, just to speed up the process.

21           THE COURT:  All right.

22           MS. ZENON-MATOS:  I want to take you a few months

23   after.  So Bimboz was on February the 2nd, 2023.  And now

24   I'm going to take you to August 17th of 2023 at the Harley-

25   Davidson store here in I-45 in Houston.

1   BY MS. ZENON-MATOS:

2   Q     First, I want to clarify.  This Harley-Davidson store,

3   is this a bar or is this a location that sells Harleys?

4   What type of location is this?

5   A     Harley-Davidson dealership is what it is.  It's a car

6   dealership but it's for motorcycles.  And it's a business

7   operated like any other car dealership with numerous

8   citizens coming and going.

9   Q     Okay.  Meaning it's open to anybody in the public.

10  A     Yes, ma'am.

11  Q     Okay.  Is this like a Bandidos store based on your

12  investigation?

13  A     No, ma'am.  There was a Bandido that worked there.  But

14  Harley-Davidson dealerships in the motorcycle world because

15  in motorcycle gangs and clubs, you're supposed to ride a

16  Harley.

17        So it's considered neutral ground because everyone has

18  to get -- either buy your Harley or your Harley accessories

19  or get your Harley worked on.  So it's supposed to be kind

20  of off limits to the -- all the nonsense of the war.

21  Q     Okay.  So according to your investigation, what

22  happened at the Harley-Davidson store on August 17, 2023

23  that involves specifically Mr. Sanchez?

24  A     There were two members of the Wheels of Soul Outlaw

25  Motorcycle Gang there, which is another one percent gang.

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                    22

1   It's not too predominant in Texas but there are some

2   members.

3        The Bandidos have a beef with the Wheels of Soul

4   because the Wheels of Soul is an ally of Beast or Brothers

5   East, their primarily rival.  The Wheels of Soul had granted

6   Beast the permission to wear the one percent diamond which

7   thus puts them in conflict with the Bandidos.

8   Q    And what happened with the Wheels of Soul

9   (indiscernible) Mr. Sanchez (indiscernible)?

10  A    Once the Bandidos -- well, there was a phone call

11  placed.  And then as more Bandidos showed up and got

12  numerical superiority over the Wheels of Soul, the two

13  Wheels of Souls members were jumped, assaulted, robbed of

14  their cuts, and the property inside of the cuts which

15  included firearms that they had on them.

16  Q    And who participated according to your investigation

17  and witnesses of that assault?

18  A    Mr. Sanchez was one of them.

19  Q    Okay.  Can you describe the specific participation of

20  Mr. Sanchez or what witnesses advised that he did?

21  A    Came up, engaged, made a verbal threat about telling

22  them to leave or he was going to blast them.  And then that

23  he was in possession of a firearm.

24  Q    Okay.  And at that time, August 17, 2023, Mr. Sanchez,

25  as you previously testified, was a convicted felon.

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                23

1   A     Yes, ma'am.

2   Q     Were there any photographs that were taken right before

3   the assault began in this location?

4   A     Yes, ma'am.

5         MS. ZENON-MATOS:  Okay.  We're going to be making

6   reference and publishing Exhibits Number 4 that was

7   previously provided to counsel.  We just want to double-

8   check if counsel had any objection.

9         MR. ALSTON:  No objections, Your Honor.

10        THE COURT:  All right.

11  BY MS. ZENON-MATOS:

12  Q     What are we seeing?

13        MS. ZENON-MATOS:  And we're publishing, for the

14  record, Exhibit Number 4, and requesting that it be

15  admitted, Your Honor.

16        THE WITNESS:  I'm sorry, did you ask what I'm

17  looking at?

18        THE COURT:  No.  She was talking to me.

19        THE WITNESS:  Oh, I'm sorry.

20        THE COURT:  Yes.  Government's Exhibit 4 is

21  admitted for today's hearing.

22      (Government's Exhibit Number 4 received in evidence.)

23  BY MS. ZENON-MATOS:

24  Q     So what are we seeing, Mr. Lyons, on the screen?

25  A     This is just moments before the assault took place.

 1  That's Mr. Sanchez with his back to the camera or video.

 2  Q    And just to clarify, we see multiple --

 3  A    Yes.

 4  Q    -- individuals there --

 5  A    Yes.  He's standing next to another Bandido.  And then

 6  the victims are outside of the camera view.

 7  Q    Okay.  And why was the person that took this picture

 8  was not able to take pictures or video of the assault?

 9  A    As soon as he started taking it, they all pretty much

10  looked at him.  And he said he got a look that I better stop

11  and get inside.

12  Q    Okay.  Let me take you now to a more closer date, April

13  11 of 2024.  As part of your investigation into the specific

14  participation of Mr. Sanchez with the Bandidos, was there

15  any search warrant that was executed at his residence?

16  A    Due to his involvement in this case, which was

17  initially investigated as engaging in organized criminal

18  activity --

19       MR. ALSTON:  Your Honor, I'm going to object to

20  the nonresponsive answer (indiscernible) ask if there was a

21  search warrant executed.  It's a yes or no question.

22       THE COURT:  Okay.  Well, why don't you just ask

23  the question again and --

24       MS. ZENON-MATOS:  Yeah.

25  BY MS. ZENON-MATOS:

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                25

1  Q    So, Officer Lyons, was there a search warrant executed

2  at his residence?

3  A    State search warrant, yes, ma'am.

4  Q    State search warrant.

5  A    Yes, ma'am.

6  Q    Okay.  And what were you looking for in accordance with

7  the warrant?

8  A    I believe it was just evidence of this crime that took

9  place.

10  Q    Okay.  And can you please relate to the Court the items

11  that were found at Mr. Sanchez's residence when you searched

12  it?

13  A    We recovered his Bandidos cut as well as four firearms.

14  Q    Four firearms, okay.  Did you take or any other member

15  of unit photographs of the items that were seized --

16  A    Yes, ma'am.

17  Q    -- at his residence?  Okay.

18        MS. ZENON-MATOS:  And now, Your Honor, we're going

19  to be asking permission to publish Exhibits 5 to 8.  Those

20  were items recovered during the search warrant.  And they

21  were provided -- and the exhibits were provided to counsel.

22  So we just want to double-check again to see

23  (indiscernible).

24        MR. ALSTON:  No objections, Your Honor.

25        THE COURT:  All right.  Exhibits 5 through 8 --

 1          MS. ZENON-MATOS:  Yes, Your Honor.

 2          THE COURT:  -- are admitted for today's hearing.

 3      (Government's Exhibits Number 5, 6, 7, and 8 received

 4  in evidence.)

 5          MS. ZENON-MATOS:  Okay.

 6  BY MS. ZENON-MATOS:

 7  Q    Publishing Exhibit 5, what are we seeing there?

 8  A    A revolver that looked very similar to the one that he

 9  had in his holster on the previously mentioned surveillance

10  tape.

11  Q    Okay.  And what about Exhibit Number 6?

12  A    Kimber semiautomatic pistol.

13  Q    Okay.  And what about Exhibit Number 7?

14  A    An AR-15 variant assault rifle.

15  Q    Okay.  And what about Exhibit Number 8?

16  A    Smith and Wesson semiautomatic pistol.

17  Q    Okay.  And all of these firearms were recovered at the

18  residence of Mr. Sanchez.

19  A    Yes, ma'am.

20  Q    Were there -- were they seized --

21  A    Yes, ma'am.

22  Q    -- by officers?

23  A    Yes, ma'am.

24  Q    Okay.  And just to again clarify, at the time of the

25  seizure, was Mr. Sanchez a convicted felon?

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                    27

1  A    Yes, ma'am.

2  Q    Okay.  Now I'm going to address what happened during

3  the arrest of Mr. Sanchez for this instant indictment that

4  occurred on February 19th, 2025, juts a couple of days ago.

5  Can you relate to the honorable magistrate what happened

6  with his arrest?

7  A    Federal search warrant served at his residence and

8  numerous items were recovered, to include a shotgun next to

9  his motorcycle in the garage, and some marijuana, as well as

10 mushrooms.

11 Q    And when you say mushrooms, what are you referring to?

12 A    Illegal psychedelic uses of mushrooms --

13 Q    Okay.

14 A    -- that people ingest.

15 Q    Were photographs taken of the items that were seized a

16 few days ago from Mr. Sanchez's residence?

17 A    Yes, ma'am.

18         MS. ZENON-MATOS:  Okay.  Your Honor, now again

19 we're making reference to Exhibits 9 to 15.  They were

20 provided.  We just want to double-check again if there are

21 objections.

22         MR. ALSTON:  No objections, Your Honor.

23         MS. ZENON-MATOS:  Now asking that their be

24 admitted, Your Honor.

25         THE COURT:  So admitted.


JUDICIAL TRANSCRIBERS OF TEXAS, LLC

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                    28

```
 1        (Government's Exhibits Numbers 9, 10, 11, 12, 13, 14,
 2   and 15 received in evidence.)
 3             MS. ZENON-MATOS:  Okay.
 4   BY MS. ZENON-MATOS:
 5   Q    Publishing Exhibit 9, what are we seeing here?
 6   A    Baggies of marijuana.
 7   Q    Okay.  And I'm going to address the marijuana issue in
 8   a minute with you.  But let's go to Exhibit Number 10; what
 9   are we seeing here?
10   A    Looks like a pump action shotgun.
11   Q    Okay.  Now Exhibit Number 11 are you seeing here --
12   A    Bandidos t-shirts, soft cuts.  I'm not sure if that's a
13   flag or a shirt.
14   Q    Okay.  And just clarify one of those shirts has the
15   name Bandidos Mexico; why is that?
16   A    Bandidos have a chapter down in Mexico.
17   Q    Okay.  And what about Exhibit Number 12 are we seeing
18   there?
19   A    The psychotic label of the -- I would need to look at
20   the report to see exactly what was in that container.
21   Q    Okay.
22   A    I'm sorry.  I don't have it in front of me.
23   Q    No problem.  Let's go to --
24   A    Oh, okay.
25   Q    -- Exhibit Number 13.
```

JOSHUA LYONS - DIRECT BY MS. ZENON-MATOS                29

1   A     Yeah.  I -- yeah, I believe that's the same container,

2   I'm sorry.  And then when we opened it, it had marijuana

3   inside of it.

4   Q     Okay.  What about Exhibit 14?

5   A     Those are the mushrooms I was speaking of.

6   Q     What about Exhibit 15?

7   A     That is Mr. Sanchez's Bandidos application that you

8   have to fill out when you're becoming a member so they can

9   do your background.

10  Q     Okay.  And just to clarify, that application was found

11  where?

12  A     Actually this was found on a cellphone exam on a

13  Bandidos --

14  Q     Okay.  And I don't know if you're able to read, if

15  not --

16        MS. ZENON-MATOS:  And, Your Honor, permission to

17  approach the witness with the actual document --

18        THE COURT:  You may.

19        MS. ZENON-MATOS:  -- which we provided this to

20  counsel.  Exhibit 15.

21  BY MS. ZENON-MATOS:

22  Q     Agent, can you please read at the bottom of that first

23  page what it says, reasons for attempting membership with

24  the Bandidos; what was the information in the application of

25  Mr. Sanchez?

1   A    He writes, because this is where my heart is.  I want

2   this and will earn every stitch.  It's where I need to be.

3   Q    Okay.  As to the marijuana that was found at

4   Mr. Sanchez's residence that we just saw in one of the

5   exhibits, did you corroborate with the Department of Public

6   Safety is -- if this marijuana can be purchased, for

7   example, with a medical marijuana license?

8   A    No.  It -- ma'am, it doesn't meet the compassionate use

9   program of medical marijuana which cannot be sold, or

10  there's no stores in Houston.

11       It's got to be -- have a doctor's prescription, and

12  it's got to be either a THC product that you ingest or can I

13  guess inhale, not packaged and sold like that in a green

14  leafy substance to smoke.

15  Q    In order to smoke.

16  A    Yes, ma'am.

17       MS. ZENON-MATOS:  Your Honor, we would like the

18  Court -- and finally -- and we going to rest as to

19  Mr. Sanchez in a second.  We would like the Court to take

20  judicial knowledge of Section 169001 of the Texas

21  occupational code.  We have a copy for Your Honor.

22       Essentially the code establishes that medical

23  marijuana cannot be marijuana that could be -- that can be

24  smoked.  And we have a copy for counsel.

25       Here's a copy for Your Honor.

1          THE COURT:  Okay.  All right.  The Court will take

2     judicial notice of Texas law, specifically the Texas

3     occupational code, Section 159.001.

4          MS. ZENON-MATOS:  And, Your Honor, with this we're

5     going to tender the witness to brother counsel who's going

6     to continue as to the acts of the next defendants.

7          THE COURT:  All right.

8          MR. BLACK:  And, Your Honor, just to pace myself

9     here, how much time approximately?

10          THE COURT:  You have 33 and a half minutes.

11          MR. BLACK:  Excellent.  Okay.

12                    CROSS-EXAMINATION

13     BY MR. BLACK:

14     Q    So, TFO Lyons, we're going to switch gears a little bit

15     here and talk about the other Defendants here today,

16     specifically we'll start with Mr. Roy Gomez.  Are you

17     familiar with Mr. Gomez per your investigation?

18     A    Yes, sir.

19     Q    So can you tell us about Mr. Gomez and his association

20     with the Bandidos?

21     A    A Bandidos member who came up through our

22     investigations coming from a support club, becoming a

23     prospect, coming a road captain with the Fort Bend County

24     chapter of the Bandidos, and then a sergeant at arms with

25     the central Houston chapter, and a member of the SS Crew.

1  Q    And when you say SS Crew, I don't know we talked about

2  that today.  Based upon your knowledge of this

3  investigation, can you tell us what the SS crew is within

4  the Bandidos?

5  A    It's a specifically designated group internal to

6  Bandidos which are handpicked, basically a group of

7  enforcers that go out and handle violent matters, or the way

8  they phrase it, kind of protect the integrity of the club

9  from internal or external threats.

10      And they have a specific patch on their cuts.  They can

11  wear it on hats, shirts, jewelry, tattoos, as Mr. Gomez has,

12  that shows you're a member of the SS Crew.

13  Q    When you say that Mr. Gomez has, what are you referring

14  to there?

15  A    He has a tattoo of the SS Crew on his body.

16  Q    And you observed that.

17  A    Yes, sir.

18  Q    So I'm going to project now what's been marked for

19  identification as Exhibit 101; do you recognize that image?

20  A    Yes, sir.

21  Q    How do you recognize it?

22  A    As Roy Gomez.

23  Q    Is this a picture of Roy Gomez in a Bandidos cut?

24  A    Yes, sir.  We have recovered this about a month -- I

25  believe it was October 31st of 2020.  And you see his

JOSHUA LYONS - CROSS BY MR. BLACK                        33

1  sergeant at arms, it's cut off, but sergeant at arms rank,

2  central Houston, it's cut off, his expect no mercy patch,

3  and the SS Crew symbol, which is down on the side of the

4  cut.  It's the Waffen lightning bolt, so Nazi Germany, with

5  a sombrero on top.

6  Q    And you recognize this individual as the Defendant

7  Mr. Gomez because you observed Mr. Gomez personally.

8  A    Yes, sir.

9          MR. BLACK:  Government offers Exhibit 101.

10         MR. ADLER:  No objection, Your Honor.

11         THE COURT:  All right.  Government's Exhibit 101

12 is admitted for today's hearing.

13     (Government's Exhibit Number 101 received in evidence.)

14 BY MR. BLACK:

15 Q    Now, you mentioned a few patches there.  We talked

16 about the SS patch.  You also referenced a expect no mercy

17 patch.  I don't think we talked about that today.  Can you

18 give us brief summary for the record?

19 A    An expect no mercy patch is a patch that is rewarded or

20 awarded and given to a Bandidos member.  And it has to be

21 awarded for committing a significant act of violence against

22 a rival, usually a violent act that spills blood.

23 Q    Do you know approximately when Mr. Gomez began

24 displaying his expect no mercy patch?

25 A    I would need to -- I know it was around this timeframe

1  in 2020.  I don't know the exact date.

2         MR. BLACK:  That's okay.

3  Q    So let's move on here to Mr. McCabe.  Have you become

4  familiar with him during your investigation?

5  A    Yes, sir.

6  Q    And Defendant Mr. McCabe, is he associated with the

7  Bandidos?

8  A    Yes, sir.  He's a member and achieved the rank as the

9  highest of a sergeant at arms of the Cloverleaf chapter.

10 Q    And how do you know that?

11 A    Again, a cut of a Bandidos will tell you everything

12 about them in terms of their -- it's their own story.

13 Again, patches earned, patches given, rank, chapter.  They

14 have patches for if you've been in five years, ten years.

15 It pretty much tells their story in the Bandidos.

16 Q    So I'm going to project now what's been marked for

17 identification as Government's Exhibit 103; do you recognize

18 this?

19 A    Yes, sir.

20 Q    How do you recognize it?

21 A    That's from a traffic stop conducted on Mr. McCabe -- I

22 don't' know the date -- but in a Bandidos cut.

23         MS. ZENON-MATOS:  Your Honor, Government offers

24 Exhibit 103.

25         MR. ROBERTS:  No objection, Your Honor.

1            THE COURT:  All right.  Government's Exhibit 103

2   is admitted for today's hearing.

3       (Government's Exhibit Number 103 received in evidence.)

4   BY MR. BLACK:

5   Q    Now, with respect to both Mr. McCabe and Mr. Gomez, do

6   you know the current association with the Bandidos as of the

7   date of their arrest?

8   A    Both are still members.

9   Q    So let's turn to September 26, 2020, aware on that date

10  there was an assault and homicide that occurred in the Hawg

11  Stop Bar.

12  A    Yes, sir.

13  Q    Are you familiar with that?

14  A    Yes, sir.

15  Q    Can you give us kind of a general rundown of it?  And

16  then we'll just focus in on Mr. Gomez and Mr. McCabe's

17  involvement in that.

18  A    Yes, sir.

19  Q    So give us a general --

20  A    Yes, sir.  There was a contest called the Ms. Hawg

21  Stop.  It was a beauty pageant being held up there.  Beast

22  members came to attend.

23       As Beast members were arriving, Mr. McCabe also arrived

24  and placed over seven phone calls to various Bandidos

25  reporting that Beast were there.

JOSHUA LYONS - CROSS BY MR. BLACK                    36

1       The Bandidos arrived, a group of them did, confronted

2   Beast about the disrespect of being at what they considered

3   their bar.  A short peace agreement seemed to have been made

4   that just kind of stay away from each other.

5       More members of the SS Crew showed up after that and

6   reconfronted the Beast members, initiated an assault, tried

7   to steal the cut off the back of one of the Beast members,

8   which ultimately led to gunfire erupting.  And that victim

9   was shot and killed.

10  Q    So let's -- I guess yesterday we kind of went over

11  this, and I want to make sure that we're all clear and the

12  record's clear.

13      So during this, there are kind of two assaults that are

14  going on, --

15  A    Yes, sir.

16  Q    -- correct?

17  A    Yes.

18  Q    So there's an assault of one Beast member who tries

19  (indiscernible) who shot and killed, correct?

20  A    Yes, sir.  So when the second confrontation happens, a

21  defendant by the name of John Pfeffer initiates that.

22      When that happens, various Bandidos, to include

23  Mr. Gomez, jump in on that assault of who would later become

24  the deceased victim.

25      When the other Beast members sees its five, six on one,

JOSHUA LYONS - CROSS BY MR. BLACK                    37

1  he runs over to try to help.  Before he can get there, two

2  Mascareros and Mr. McCabe, the Bandido, jump on that second

3  victim, assault him out into the ditch.

4  Q    So let's talk about -- let's actually start with the

5  assault that Mr. McCabe was directly involved in.  Walk us

6  through -- well, let's even go before that, his involvement

7  in what happened at Hawg Stop and then what happened in that

8  assault.

9  A    When he arrived, it was only one Beast member was

10 there.  Mr. McCabe arrived with his wife.  They parked.

11 Mr. McCabe saw that there was a Beast member there.  He gets

12 on the phone and he's -- you know, we have the phone

13 records.

14      He's on video on the phone, calls I think -- I have not

15 looked in my report or needed -- at least seven different

16 Bandidos, to include chapter presidents of various chapters,

17 and a member of the SS crew, basically reporting that Beast

18 was up there.  And then that led to the Bandidos responding.

19      And then, once again, they had numerical superiority,

20 they called Beast out and were kind of waiting around to see

21 how it went.

22      So Mr. McCabe was part of that initial confrontation

23 that ended peacefully.

24      Then when more SS Crew members arrived, all the

25 Bandidos met with them.  And then they walked back over to

JOSHUA LYONS - CROSS BY MR. BLACK                    38

1  reconfront.  Mr. McCabe came with that group.  And then when

2  the assault happened, Mr. McCabe chased a Beast member into

3  the bar.

4      And once that -- he went into the bar and was out of

5  the fight, then Mr. McCabe came back out and then engaged in

6  the -- assaulted the member, the Beast member in the ditch.

7  Q    Tell us more about that assault that Mr. McCabe

8  perpetrated against the other Beast member, the one who

9  didn't die.

10 A    He was wearing a soft cut, which is basically a Beast

11 cut in a t-shirt form that you can wear --

12 Q    And that's -- that being that victim was wearing.

13 A    Yes, sir.  And that was ripped from his body, and he

14 never saw it again.  And he was hit around but ultimately

15 let go.

16 Q    And you've give us a lot of information about what

17 happened there.  How do you know this, how did you kind of

18 piece together what transpired at Hawg Stop?

19 A    Victim statements, eyewitness statements.  There's

20 great surveillance video from the different angles that we

21 recovered from the Hawg Stop bar.  There was a pole camera,

22 a law enforcement pole camera up as well that saw a good

23 chunk of this.

24      The call detail records of Mr. McCabe and Mr. Gomez,

25 various Bandidos.

1  Q    And putting all this together, including the

2  surveillance video, did that depict Mr. McCabe, the

3  Defendant here, engaged in that assault and robbery of the

4  Beast victim you identified?

5  A    Yes, sir.

6       (Pause)

7  Q    So let's turn to Mr. Gomez here.  Walk us through

8  Mr. Gomez's involvement in the assault and murder at Hawg

9  Stop on September 26th.

10 A    Mr. Gomez arrived in his tow truck.  He is a wrecker

11 driver.  He arrived after the first confrontation that ended

12 in a relatively peaceful terms.  He arrived and parked.

13      And he gets out and meets with two more SS Crew members

14 that were there in the parking lot.  They then meet with

15 Mr. McCabe and some other Bandidos.

16      They go to the bar, get a drink, and then Mr. Gomez

17 ultimately goes out to his wrecker, comes back, not sure

18 what he got or -- from the wrecker or not; comes back.

19      And then when John Pfeffer walks over to instigate and

20 start the fight or what would be the second confrontation,

21 Mr. Gomez walks over with him.

22      As the fight breaks out, Mr. Gomez goes and engages in

23 it and ultimately pulls out a firearm and shoots the victim.

24 Q    And when you say -- let's talk about the victim.  The

25 victim there ultimately succumbed to their gunshot wounds

1    and died, correct?

2    A    Yes, sir.

3    Q    Can you tell us about the gunshot wounds that victim

4    sustained?

5    A    He had five -- well, he had six through-and-throughs,

6    five went through the back and exited the front, and then

7    one went through the front.

8    Q    Was it ever determined how many shooters were involved

9    in what transpired?

10    A    It -- three due to three different shell casings.

11    Q    And who all was identified as a shooter in that?

12    A    The only individual that we have on video shooting is

13    Roy Gomez.

14    Q    And that's the Defendant Roy Gomez here today.

15    A    Yes, sir.

16    Q    So what happened next as far as Mr. Gomez?

17    A    Once the shots rang out, Mr. Gomez evaded or, you know,

18    ran to his tow truck, immediately departed; ended up meeting

19    up with Mr. Pfeffer, who was struck by rounds.

20         Mr. Pfeffer dumps his truck, gets into Roy Gomez's tow

21    truck.  Roy drives Pfeffer to a hospital and drops him off.

22    Q    So let's just talk before we move on a little bit here

23    about the dynamics of the assault and murder that occurred.

24    So how many Beast members in total were at Hawg Stop that

25    evening?

1  A     Three.

2  Q     And how many approximately Bandidos members or Bandidos

3  associates were there?

4  A     For the second confrontation that it was 11, so 11

5  against three.

6  Q     And once the fight and the assaults actually started,

7  how many individuals were directly involved in the assault

8  of the victim who was ultimately killed?

9  A     If I can name them out, it would be easier for me --

10 have to track it in my head.  There was Arvin Bartlett

11 (phonetic), John Pfeffer, Roy Gomez, Marky Baker, Marcel

12 Lett, Jeremy Cox.  So that's six.

13 Q     And how was the fight going for the Beast victim before

14 they were shot and killed?

15 A     He never had a chance.  He was on his face on the

16 ground the whole time.

17 Q     I'm aware that following this assault and murder there

18 were a number of search warrants and some additional

19 investigation conducted; is that right?

20 A     Yes, sir.

21 Q     And that included I'm aware a search warrant executed

22 at Mr. Gomez's residence, correct?

23 A     Yes, sir.

24 Q     Can you tell us about that?

25 A     We served a federal search warrant at his house.  The

1  Harris County had also obtained a murder warrant, a state

2  murder warrant for Mr. Gomez.

3      Inside the residence we recovered various Bandidos

4  paraphernalia, recovered a semiautomatic .40 caliber pistol

5  like up in the laundry room like it was trying to be hidden.

6      And we found a note, like a sticky note, with three

7  Beast members and license plates.

8  Q    Was that -- so the Beast note with their information,

9  was that (indiscernible)?

10 A    Yes, sir.

11 Q    Why is that?

12 A    We found several throughout our investigation where

13 they're basically putting out hits and collecting

14 intelligence on Beast members, their names.

15     And they do research to get license plates, addresses,

16 and basically people that they -- or Beast members that they

17 want to go after and target.

18 Q    Okay.  So we're going to jump forward here a fair

19 amount, and we're going to talk about something that

20 happened with Mr. McCabe at the Love's gas station in

21 Baytown, Texas on May 9, 2024; are you familiar with that?

22 A    May of 2024, yes, sir.

23 Q    Yes, yeah.

24 A    Yes, sir.

25 Q    Can you tell us about that?

1  A    We had gotten a reporting of this that there was a

2  confrontation at the Love's gas station, which was very

3  crowded at the time, during the middle -- or towards the

4  evening, that some Beast members were there fueling up, gas,

5  etcetera, doing what you do at gas stations.

6        Some Bandidos also happened to be there.  And there was

7  a kind of a stare down confrontation that ultimately ended

8  in shots fired.

9  Q    Was -- were the participants in that ever identified?

10 A    A few of them were.

11 Q    Tell us about them.

12 A    We were able to obtain surveillance video from inside

13 the Love's, and we were able to identify some of the Beast

14 members present, and at least one Bandidos member present.

15 Q    And was one of the Bandidos identified as Mr. McCabe?

16 A    Yes, sir.

17 Q    I'm aware that ultimately some surveillance video was

18 obtained and viewed regarding what transpired.

19 A    Yes, sir.

20 Q    And it depicted Mr. McCabe, correct?

21 A    Yes, sir.

22 Q    Can you tell us about what you saw on that?

23 A    He was wearing a black shirt, I think blue jeans as

24 well.  And he's kind of standing in almost like an old west

25 gunfighter stance with his hands around two pistols in his

1  waistband, kind of stare downing with the Beast members.

2  Q    I'm going to project here what has been marked for

3  identification purposes as Government's Exhibit 114; do you

4  recognize this?

5  A    Yes, sir.

6  Q    How do you recognize it?

7  A    The surveillance from -- and recovered from the Love's

8  truck stop that's got Mr. McCabe with his back turned to the

9  camera with his hands on pistol grips.

10  Q    And this obviously isn't the video.  Is it a still --

11  A    Yes.

12  Q    -- shot of the video?

13  A    Yes.

14  Q    However, it is a fair and accurate portion or still

15  shot of the video?

16  A    Yes, sir.

17        MR. BLACK:  Government offers Exhibit 114.

18        MR. ROBERTS:  No objection.

19        THE COURT:  Government's Exhibit 114 is admitted

20  for today's hearing.

21     (Government's Exhibit Number 114 received in evidence.)

22  BY MR. BLACK:

23  Q    And I think the photo's mostly self-explanatory, but

24  just to make it clear for the record, can you describe where

25  in Exhibit 114 Mr. McCabe is?

1  A    Yes.  He's the individual with the black shirt, blue

2  jeans, kind of receding hair right there almost in the

3  middle.

4  Q    And he's standing kind of right in front of or on the

5  side of a white truck; is that him?

6  A    Yes, sir.  Yeah, right behind a motorcycle.

7  Q    Let's talk about another incident.  And this time we're

8  going to move chronologically, we're going to talk about

9  Mr. Gomez.  I'm aware that on February 6, 2025 there was a

10  report relating to a firearm offense involving Mr. Gomez;

11  are you familiar with that?

12  A    Yes, sir.

13  Q    Tell us about that.

14  A    Mr. Gomez, again being a tow truck wrecker driver, I

15  guess I don't know if he was dispatched to the call, began

16  to tow a vehicle.

17      The occupants were still inside of it.  They got out.

18  An argument ensued.  And the victims allege that Mr. Gomez

19  pulled a firearm.  No shots were fired.  Mr. Gomez

20  eventually left.  Law enforcement arrived and a report was

21  taken.

22  Q    And fair to say that investigation's still ongoing

23  given its recency?

24  A    Yes, sir.

25            MR. BLACK:  Okay.  Finally we're going to talk

1    about the arrest of these two individuals here and go

2    through them separately.

3              THE WITNESS:  Yes, sir.

4    Q    So let's start with Mr. Gomez.  Were both Mr. Gomez and

5    Mr. McCabe indicted by a federal grand jury in February?

6    A    Yes, sir.

7    Q    This year?

8    A    Yes, sir.

9    Q    And then were arrest warrants issued for them?

10   A    Yes, sir.

11   Q    Were search warrants also secured to search their

12   residences?

13   A    Yes, sir.

14   Q    So talking about Mr. Gomez first, on February 19, 2025,

15   did law enforcement engage in an operation to both arrest

16   Mr. Gomez and also execute that warrant on his residence?

17   A    Yes, sir.

18   Q    So I guess walk us through how that unfolded because

19   it's my understanding he wasn't found at his residence,

20   correct?

21   A    He was not.  That was his residence.  That's the

22   residence on his bond paperwork.  That's where his GPS

23   monitor he had been on had been.  That's where law

24   enforcement responded.

25         He was not there.  But the search warrant was served

1  anyway of course.  Inside of the room where the other

2  occupant identified as Mr. Gomez's room were several

3  firearms.

4      Mr. Gomez was later found at another location staying,

5  which is a violation of his bond, and he was placed under

6  arrest.

7  Q   So you went -- made reference a few times there to

8  bond.  Mr. Gomez was on some sort of bond at his arrest.

9  A   He was still on bond for basically the incident at the

10  Hawg Stop.  As we were investigating it federally, it was

11  also being invested state level.

12      So he had been arrested for that state charge and had

13  been on bond for that murder throughout the rest of the

14  period of our investigation, throughout all the stuff we've

15  just spoken about.

16  Q   And did the conditions of his bond prohibit him from

17  doing a variety of things, including committing new crimes?

18  A   Yes, sir.

19  Q   And was he also prohibited from associating with other

20  Bandidos?

21  A   Yes, sir.

22  Q   I'm going to take a quick aside here since it kind of

23  fits in here, dovetails in here.  Between the time that

24  Mr. Gomez was placed on bond in the state case and present,

25  have you observed him engaging with other Bandidos members?

1    A    Yes.  We've done surveillance at different bars for

2    different operations against the Bandidos and have observed

3    him arrive and associate with Bandidos.

4    Q    And is this we're just talking about once or twice or --

5    A    A few times.  Again, I don't have the number in front

6    of me.  We've got surveillance reports regarding when we saw

7    him, you know, individuals -- or he would invite them to his

8    house to, you know, try to meet there instead of going out

9    in public where he might be seen by law enforcement.

10    Q    Okay.  So let's turn back to the warrant here.  This

11    was a warrant at 205 Shenandoah Drive in Richmond, Texas; is

12    that right?

13    A    Yes, sir.

14    Q    And was that the address on his state bond?

15    A    Yes, sir.

16    Q    So tell us about in a little bit more detail the items

17    recovered within that residence.

18    A    Again, numerous firearms throughout the residence but

19    numerous inside of the room that was where Roy Gomez was

20    staying.  And we had been told by the other occupant that

21    that was his room.

22    Q    We'll go through some photos here to take a moment

23    here.

24         Can Mr. Gomez lawfully possess firearms in the United

25    States?

1   A    No, sir.

2   Q    Why is that?

3   A    At least I believe it's three felony convictions here

4   in Texas and time in TDCJ.

5   Q    So I'm going to project here a number of exhibits

6   starting with Exhibit 115 through 147.  And just by

7   reference here, you reviewed photographs taken of the search

8   of his residence prior to coming here to court today,

9   correct?

10  A    Yes, sir.

11  Q    And do those photographs in Exhibits 115 through 147

12  fairly and accurately depict the items discovered in his

13  residence?

14  A    Yes, sir.

15          MR. BLACK:  Government offers Exhibits 115 through

16  147.

17          MR. ADLER:  No objection.

18          THE COURT:  All right.  Exhibits 115 through 147

19  are admitted for today's hearing.

20      (Government's Exhibits Numbers 115 through 147 received

21  in evidence.)

22          MR. BLACK:  So we're going to march through these

23  here, just kind of orient us as we go through these.

24  BY MR. BLACK:

25  Q    Starting with Exhibit 115, can you tell us about this?

1  A    That's the room that had been identified as the room

2  that Roy Gomez would stay in.

3  Q    On the back wall do we have a number of --

4  A    Oh, yes.

5  Q    -- some firearms?

6  A    There's a AR-15 variant hanging on the wall.

7  Q    Next, Exhibits 116 is just another --

8  A    Yes, sir.

9  Q    -- view of that same room.

10 A    Yes, sir, with the Bandidos shirt or flag hanging there

11 on the wall.

12 Q    That's on kind of the right side of the photo.

13 A    Yes, sir.

14 Q    Exhibit 117, just another view of that room.

15 A    That will be -- yes, sir.

16 Q    Exhibit 118, another view of that room --

17 A    Yes.

18 Q    -- for orientation.

19 A    Yes, sir.

20 Q    All right.  Exhibit 119 there, we have a different

21 location there, right?

22 A    Yes.  That's where a lot of Roy Gomez's property in the

23 garage was stored kind of down on the floor.  And like

24 around where that cowboy shirt is, there's a little tray of

25 marijuana like it's being rolled into cigarettes.

JOSHUA LYONS - CROSS BY MR. BLACK                    51

1  Q    We're going to go back to the other real quick.  Here

2  is Exhibit 120; is that that Bandidos item displayed on the

3  wall?

4  A    Yes, sir.

5  Q    Exhibit 121, tell us about this.

6  A    Just out in the open there by the chair of that room

7  that where Roy Gomez stayed is like a shortened, condensed

8  SKS/AK-47-type variant with a high magazine drum.

9  Q    And Exhibit 122, is that just closer, clearer picture

10 of that?

11 A    Yes.

12 Q    And Exhibit 12, what is the significance of this

13 photograph?

14 A    Just looking at the rounds which I believe are 7.62,

15 I'd have to zoom in on to see, but just the high capacity

16 magazine.

17 Q    What do we have in Exhibit 124 here?

18 A    Right on the side of the chair in close proximity to

19 that rifle is a pistol, semiautomatic pistol in like a

20 little side compartment for easy access.

21 Q    Exhibit 125.

22 A    That's the pistol.

23 Q    How about Exhibit 126?

24 A    In a drawer next to both of those firearms is another

25 semiautomatic pistol.

1  Q    And 127, is that another photo of that pistol?

2  A    Yes, sir.

3  Q    And Exhibit 128, why is this important?

4  A    Just showing that it was a loaded pistol.

5  Q    Exhibit 129.

6  A    The AR that's mounted on the wall.

7  Q    Exhibit 130, that just showing that weapon?

8  A    Yes, sir.

9  Q    Exhibit 131.

10 A    Another assault -- actually, that -- I maybe need to

11 see the other photo.  I can't tell I -- that might be a

12 semiautomatic shotgun.

13 Q    Okay.  I'll go --

14 A    Yes.

15 Q    -- to 132 here.

16 A    Yes, sir, looks like a semiautomatic shotgun that would

17 be loaded with a magazine in the back.

18 Q    Exhibit 133.

19 A    That's the bottom frame of a semiautomatic pistol,

20 along with ammunition for the various weapons.

21 Q    And this -- everything we've looked at so far as far as

22 the firearms, this in the room identified as Mr. Gomez's.

23 A    Yes, sir.

24 Q    Is 134 a picture of that handgun lower?

25 A    Yes, sir, lower assembly.

JOSHUA LYONS - CROSS BY MR. BLACK                53

1  Q    Exhibit 135.

2  A    I believe that's a .410 single shot shotgun.

3  Q    Exhibit 136.

4  A    Lever action repeater rifle.

5  Q    Exhibit 137, this is a black bag, correct?

6  A    Yeah.  I believe that's inside the garage where Roy

7  Gomez's property was.

8  Q    We'll move forward to Exhibit 138.  Are these the

9  contents of that black bag?

10 A    Yes, sir.  Scale for, you know, typically we see in our

11 training and experience for weighing out narcotics.  And

12 then what looks like marijuana grinders.

13 Q    Exhibit 139.

14 A    That's that little plate I mentioned earlier to grind

15 marijuana and roll it into cigarettes.

16 Q    Exhibit 140, we see in Mr. Gomez's room a purse hung

17 up; is that right?

18 A    Yes, sir.

19 Q    And what we see inside of there, what is this?

20 A     A pistol, semiautomatic pistol.

21 Q    This 142, is that a picture of that pistol?

22 A    Yes, sir.

23 Q    And 143, is this showing that there were rounds in the

24 magazine of that pistol?

25 A    Yes, sir.  That's how we'll photograph it when we find

1  that there's a round in the chamber.  And then of course

2  rounds in the magazine.

3  Q    What does it mean when a round's in the chamber?

4  A    It means that it's locked and loaded.  That term is

5  heard where, you know, with semiautomatic pistol, you can

6  put a clip in but you don't -- but you have to seat a round,

7  where now all you have to do is pull the trigger.

8  Q    Exhibit 144, we're looking at a different area now; is

9  that right?

10  A    Yeah.  This is actually I believe his roommate's room.

11  Q    Okay.  So we'll go through these last photos quick

12  here.  But there's in 145 a weapon found in a drawer in his

13  roommate's room; is that right?

14  A    His roommate had several firearms.

15  Q    And 146, another picture of one of those weapons.

16  A    Yes, sir.

17  Q    And then Exhibit 147, one of his roommate's weapons.

18  A    Yes, sir.

19  Q    Okay.  So let's talk about Mr. McCabe now.  So similar

20  to Mr. Gomez, was there also an arrest warrant and a search

21  warrant executed for Mr. McCabe at his residence on February

22  19, 2025?

23  A    Yes, sir.

24  Q    Can you tell us about that?

25  A    Yes, sir.  Law enforcement approached, announced with

1  lights and sirens, knocked on the door; several minute of no

2  response.  And then finally Mr. McCabe engaged his voice.

3  And when they told him to open the door, he said he would

4  not, that he wanted to contact his lawyer first.

5       And for officer safety the officers then, because he

6  refused to comply with the command, breached the residence

7  and placed him under arrest.  And then the search warrant

8  was executed.

9  Q    During the search of that residence what, if anything,

10  did officers discover?

11  A    His Bandidos cut, numerous firearms.

12  Q    And where were those firearms located in the residence?

13  For example, were these hidden away somewhere or were they

14  easily accessible?

15  A    Easily accessible.

16  Q    Okay.  So I'm going to refer you now to what you've

17  previously looked at as Exhibits 162 to 193; are those

18  photographs of the items discovered within Mr. McCabe's

19  residence on February 19, 2025?

20  A    Yes, sir.

21  Q    And you reviewed those before Court today, correct?

22  A    Yes, sir.

23  Q    And are they fair and accurate depictions of those

24  items?

25  A    Yes, sir.

1      MR. BLACK:  Government offers Exhibits 162 to 193.

2      MR. ROBERTS:  No objection.

3      THE COURT:  All right.  Government's Exhibits 162

4  to 193 are admitted for today's hearing.

5    (Government's Exhibits Numbers 162 through 193 received

6  in evidence.)

7  BY MR. BLACK:

8  Q    Okay.  So projecting here -- we're just going to march

9  through these like we did for Mr. Gomez -- starting with

10  Exhibit 162, can you tell us about this?

11  A    Mr. McCabe's Bandidos cut.

12  Q    One sixty-three, is that the front of that cut?

13  A    Front of the cut, yes, sir.

14  Q    How about 164?

15  A    A set of body armor.

16  Q    What's the significance of that?

17  A    We've seen throughout the war that's been engaged or

18  that's still going on that numerous members on all side are

19  purchasing or obtaining body armor to wear when they're out

20  riding for fear of retaliatory shots against them.

21    Or, if they're out conducting violence, just like law

22  enforcement when we know we're going to be doing high risk

23  operations, we'll vest up before we go.

24  Q    Exhibit 165.

25  A    Semiautomatic pistol in a drawer.

1    Q    Exhibit 166.

2    A    Semiautomatic pistol that was in his truck.

3    Q    Exhibit 167.

4    A    Magazines for a pistol.

5    Q    Exhibit 168.

6    A    Just Bandidos belt buckle, standard, very common, a

7    holster, and looks like a wallet.

8    Q    And BFFB, I don't know if we talked about it today, but

9    what does that acronym mean?

10   A    It's a common phrase you'll see on items or even

11   tattoos.  It means Bandidos forever, forever Bandidos.

12   Q    Exhibit 169.

13   A    That's common for the old lady or wife of a Bandidos

14   member to kind of brag and even display their own red and

15   gold cuts or like this a belt.  Ronnie McCabe's nickname is

16   "Meathead," and so this would be his wife's belt saying that

17   she's his old lady.

18   Q    Exhibit 170.

19   A    Just Bandidos patches.

20   Q    One seventy-one.

21   A    I think that was where Ronnie McCabe's passport was and

22   his handcuffs or just a set of handcuffs.  Semiautomatic

23   pistol.

24   Q    Exhibit 172, correct?

25   A    Yes.

1   Q    Exhibit 173.

2   A    Magazines for an AR-15-type variant assault rifle.

3   Q    Exhibit 174.  It's a little hard to see.  Is --

4   A    Yes, sir.

5   Q    -- this a firearm case?

6   A    Yeah.  It's -- it looks like an AR-15 model and then a

7   revolver.

8   Q    Exhibit 175 is --

9   A    Another photo of that.

10  Q    Exhibit 176, close-up of that revolver.

11  A    Yes, sir.

12  Q    And Exhibit 177, another overall photo.

13  A    Same.  Yes, sir.

14  Q    Exhibit 178.

15  A    Looks like another rifle.

16  Q    Exhibit 179.

17  A    Another set of body armor, separate than the other one.

18  Q    Exhibit 180.

19  A    A Bandidos cut.

20  Q    Exhibit 181.

21  A    The Bandidos cut again.

22  Q    And Exhibit 182, another picture of that cut with the

23  patches.

24  A    Various patches.

25  Q    Exhibit 183, picture of the backup cut.

1   A    Yes, sir.

2   Q    Exhibit 184, it probably bears a little bit more

3   discussion; what is this?

4   A    That is a -- just a Bandidos application for an

5   individual that Mr. McCabe has a copy of.  And that could be

6   due to him having a sergeant at arms rank that would be

7   responsible for doing -- well, collecting, doing house

8   inspections, and pushing through the background.

9   Q    Exhibit 185.

10  A    The rifle and pistol again, revolver.

11  Q    Exhibit 186.

12  A    Another semiautomatic pistol.

13  Q    Exhibit 187.

14  A    His helmet.

15  Q    And I guess going back to that, fair to say that has a

16  Bandidos signature on it?

17  A    Yes, sir.  Yeah, they'll -- they're usually very clear

18  to everybody that they're a Bandidos member.

19  Q    Exhibit 188.

20  A    One of their vehicles that, you know, I guess he's a

21  pilot car driver but in red and gold lettering and little

22  shamrocks, which is a symbol of the Cloverleaf chapter.  It

23  is a cloverleaf of the Bandidos.

24  Q    Exhibit 189, is this a firearm found in a pocket of

25  that vehicle?

JOSHUA LYONS - CROSS BY MR. BLACK                    60

1    A    Yes, sir.

2    Q    Exhibit 190, is that that firearm?

3    A    That's one that was in the truck.  I think it just got

4    out of order.

5         MR. BLACK:  Okay.  Got it.  Thank you.

6    Q    And showing that the -- it was -- had a loaded

7    magazine.

8    A    Yes, sir.  And had one in the chamber.

9         MR. BLACK:  Okay.  Good, thank you.

10   Q    Exhibit 191.

11   A    Those are the two rifles that were in the cases.  They

12   were taken out.

13   Q    Exhibit 192.

14   A    One of the semiautomatic pistols that had been

15   recovered, just a closeup of it.

16   Q    And Exhibit 193, just another --

17   A    Same.

18   Q    -- picture of those same weapons.

19   A    Yes, sir.  Some of them got out of order.

20        MR. BLACK:  All right.  So just a few kind of

21   wrap-up questions here.

22   Q    Was Mr. McCabe's phone searched pursuant to the search

23   warrant?  Seized.

24   A    Yes, sir.

25   Q    Okay.  And should have started a little earlier than

JOSHUA LYONS - CROSS BY MR. BLACK                                61

1  that.  Was the phone seized from him following arrest?

2  A    Yes, sir.

3  Q    And was it searched pursuant to a warrant?

4  A    Yes, sir.

5  Q    What, if anything, thus far has been learned from that?

6  A    Just numerous photos and Bandidos clothing, photos of

7  him and his wife who also has Bandidos cut and clothing.

8  Q    Fair to say that that only just began like very, very

9  recently?

10 A    Just yesterday.

11 Q    During your investigation, I'm aware that you received

12 some information regarding potential flight risk for

13 Mr. McCabe; is that right?

14 A    Yes, sir.  We had received reporting that after this

15 Hawg Stop incident, that he had made a statement that if he

16 was indicted on it, he would flee to Colombia, where his

17 wife is from, where his passport shows travel to.

18 Q    Now, finally, this war between Bandidos and Beast, what

19 is the current state of that war?

20 A    Ongoing.

21 Q    And what is the expectation of members of the Bandidos

22 and their associates in that war if they encounter a Beast

23 smuggling?

24      (Alarm ringing.)

25 A    It's called a smash onsite.  If you see them, take care

1  of them.

2          MR. BLACK:  That's all the questions I have.

3  Thank you.

4          THE COURT:  All right.  Mr. Adler, would you like

5  to go first since you're standing?  All right.

6          MR. ADLER:  Yes.

7          THE WITNESS:  However, sir.  I'll -- it doesn't

8  matter.

9          MR. ADLER:  (Indiscernible).

10          THE WITNESS:  Yeah.  Sounds like my dad, though.

11      (Laughter)

12                  CROSS-EXAMINATION

13  BY MR. ADLER:

14  Q    How long have you been in law enforcement?

15  A    Since 2007, so going on 18 years, sir.

16  Q    And you started with what agency?

17  A    The Texas Board of Criminal Justice, Inspector

18  General's Office.

19  Q    So that was your first law enforcement?

20  A    Yes, sir.

21  Q    What did you do before that?

22  A    United States Marine Corp, and then I trained law

23  enforcement briefly when I got out of the Marines.  They

24  asked me to train law enforcement.

25  Q    And what was your occupational specialty in the Marine

JOSHUA LYONS - CROSS BY MR. ADLER                          63

1  Corp?

2  A    It was a motor transport officer.

3  Q    And you served four years or --

4  A    Four years, two combat tours in Iraq.

5  Q    And then you went directly from the Marine Corp to

6  Texas Department of Criminal Justice?

7  A    Briefly worked for a training institute, Sam Houston

8  State, and then went into law enforcement.

9  Q    Okay.  Sam Houston State was also law enforcement

10 training.

11 A    Yes, sir.

12 Q    And you've been testifying at a lot of these hearings.

13 A    Yes, sir.

14 Q    And you're the only witness here today that's going to

15 testify for the Government; is that correct?

16 A    Yes, sir.

17 Q    And you know of course from not only this case but your

18 extensive law enforcement background that the judge is going

19 to make her decision based on your testimony and

20 credibility.

21 A    Amongst other things I assume.

22 Q    With that in mind, can you tell us if you've had any

23 disciplinary issues during the time you served in the Marine

24 Corp or with Texas Department of Criminal Justice?

25 A    No disciplinaries.

1  Q     None?

2  A     None.

3  Q     In either.

4  A     None, no, sir.

5  Q     Okay.  The -- you mentioned the state charge of murder

6  against Mr. Gomez during your testimony.

7  A     Yes, sir.

8  Q     What is the status of that charge?

9  A     I believe they just dismissed it once they heard we

10 indicted it federal.

11 Q     Okay.  And that charge was filed approximately when?

12 A     The state charge?

13 Q     Yeah.

14 A     I believe it was November because that's when we

15 executed the arrest warrant.  So, yeah, I don't think we had

16 the warrant that long.

17 Q     November of what year?

18 A     I'm sorry, 2020.

19 Q     Okay.  So Mr. Gomez was arrested on that now dismissed

20 murder charge four years ago.

21 A     November, '20 so, yeah, maybe -- yeah, something like

22 that.

23 Q     And how many times did he appear in court on that

24 charge?

25 A     I don't have the number of when -- how many times he

1   appeared.  But we never heard he didn't.

2   Q    Do you have any -- I was just going to ask you --

3   A    Yeah.

4   Q    -- if you had any information to show that he failed to

5   appear in court.

6   A    No, sir.

7   Q    You have any information that in any of the criminal

8   cases that he's been charged with that he's failed to appear

9   in court?

10  A    Don't have that, no, sir.

11  Q    You have no --

12  A    No.  Yes, sir, no information.

13  Q    While -- or after he was charged with murder in state

14  court, those four years that he was on bond, did you conduct

15  or anybody on the task force or whatever group you call it

16  conduct any surveillance on Mr. Gomez?

17  A    On him?

18  Q    Yes.

19  A    Well yes, sir.  That's how we saw him at some of these

20  Bandidos events.

21  Q    Okay.  Other than associating with other people in the

22  Bandidos, did you see him assault any other?

23  A    Assault, no, sir.

24  Q    You see him sell any drugs?

25  A    No, sir.

JOSHUA LYONS - CROSS BY MR. ADLER

1    Q    See him rob anybody?

2    A    No, sir.

3    Q    The people you mentioned in the tow truck incident,

4    have you spoke with them?

5    A    I have not, no, sir.

6    Q    Do you know why their car was being towed?

7    A    No, sir.

8    Q    Do you know their backgrounds?

9    A    No, sir.

10   Q    Obviously I'm assuming they were not happy their car

11   was towed.

12   A    I assume so.

13   Q    Was there any video supporting this claim that

14   Mr. Gomez pulled a gun on them?

15   A    I was -- again, semi-recently heard about it, and I

16   have not made contact.  I'd just seen the report.

17   Q    Okay.  Do you know the criminal history of those people

18   that made this claim that he pulled a gun?

19   A    No, sir.

20   Q    The murder that happened at the Hawg Stop, how many

21   guns were recovered?

22   A    We did not recover -- oh, I'm sorry.  We recovered one

23   firearm.  I believe it was the .45.

24   Q    Okay.  Were fingerprints run on that gun?

25   A    I would have to see the reports from the Harris County

1  Forensic Institute.  I don't remember, no, sir, I'm sorry.

2  Q    If they came back to Mr. Gomez's fingerprints, you

3  would likely remember that.

4  A    Oh, yes, sir.  Yeah, I would have remembered that.

5  Q    Okay.  You're not telling the Court that it came back

6  to Gomez.

7  A    No, sir.

8  Q    Okay.  Shell casings recovered at the scene.

9  A    Yes, sir.

10  Q    Different varieties, different calibers.

11  A    Three different, yes, sir.

12  Q    Any fingerprints run on any of those shell casings?

13  A    I would need to look at the reports.  I don't believe

14  we got any back.

15  Q    So again no evidence -- no forensic, scientific

16  evidence that Mr. Gomez's fingerprints were on any of those

17  shell casings.

18  A    On the shell casings, no, sir.

19  Q    Were any of the guns seized from the residence that you

20  searched for Mr. Gomez, were any of those tested

21  ballistically to see if those match the bullets in the

22  decedent?

23  A    We only got the one right afterwards.  And I don't

24  believe that that .40 was a match.

25  Q    I'm talking about the guns that you showed all these

1   pictures that was found in the house.

2   A    That was just that -- the ones we just got on the 19th,

3   I don't think I had the reports back on the -- those are

4   usually entered into an NIBIN system, and I haven't seen the

5   reporting.

6   Q    So, again, for this judge, you have no evidence that

7   any of those guns in that house were associated with the

8   murder at the Hawg Stop.

9   A    At this time I don't have any information that those

10  guns were associated.

11  Q    Well, and at this time we're having this hearing,

12  right?  We're not --

13  A    Yes, sir.

14  Q    Okay.  During the course of the investigation you have

15  referenced in this hearing and some other hearings a video

16  that you (indiscernible).

17  A    Yes, sir.

18  Q    Was that video recorded by the pole camera that you

19  said law enforcement?

20  A    Of the shooting, no, sir.

21  Q    Okay.  Where -- what camera would this -- was that an

22  individual holding a phone?

23  A    Yes, sir.

24  Q    Okay.  And has that video been provided to the defense?

25  I know we got a lot of material.

1   A    Yes, sir.  It's in there.  We were able to slow it down

2   and do -- you know, so it's the one original video and then

3   some ones where we're able to crop and slow.  And all that

4   should be in there.

5   Q    But you haven't shown that video here today, right?

6   A    I -- no, sir, it wasn't played.

7   Q    Okay.  The picture of Mr. Gomez in the vest with the

8   Bandido labels, --

9   A    Yes, sir.

10  Q    -- when was that taken?

11  A    We were -- the date on the top of it was October 31st

12  of 2020, I believe.

13  Q    Okay.  Were there any what we call Title Three wire tap

14  phone intercepts on any phone owned by Mr. Gomez?

15  A    No, sir.

16  Q    Were there any recordings made of discussions with

17  Mr. Gomez that you're aware of?

18  A    No, sir.

19  Q    This expect no mercy patch, you said it's a reward for

20  an act of violence.

21  A    Yes, sir.

22  Q    Do you have any information why Mr. Gomez got that?

23  A    Specifically his, no, sir.

24  Q    Okay.  You said you looked at phone records and that

25  Mr. McCabe had made some calls to others at the Hawg Stop.

1   A    Yes, sir.

2   Q    Was Mr. Gomez's phone one of the people on the phone?

3   A    No, sir, not by Mr. McCabe.

4   Q    Is the cellphone video similar in clarity to the pole

5   camera video?

6   A    It has its moments as zooming in and out and then some,

7   you know, people that are -- or, sorry, a hand that like

8   maybe cuts in front of it.  But it's actually a little

9   sharper.

10  Q    A little sharper than the pole camera video.

11  A    Yes, sir.

12          MR. ADLER:  And so I'm just going to, Judge, show

13  this to the witness.

14          Is this -- this is I think your Exhibit 105 in one

15  of the other hearings.

16  Q    Is that the pole camera?

17  A    That's a still from the pole camera.

18  Q    Okay.  And you're saying the cellphone video's a little

19  clearer than this.

20  A    Yes, sir.  It's closer in terms of the people.  Yeah,

21  they're not that far away in the cellphone video.

22          MR. ADLER:  Okay.  And I guess just for the

23  record, Judge, I move to admit this 105 (indiscernible).

24          Any objection?

25          MR. BLACK:  No objection.

1           THE COURT:  Actually if you're going to admit

2  anything, do you have a copy for him?

3           MR. ADLER:  I'll get one right now.

4           THE COURT:  Okay.  Exhibit 105, you say?

5           MR. ADLER:  It's labeled 105 from the Government.

6  We would call it Government's --

7           THE COURT:  Okay.

8           MR. ADLER:  -- Exhibit 1, if that's easier for the

9  record.

10          THE COURT:  All right.

11  BY MR. ADLER:

12  Q    One of the hallmarks of these motorcycle clubs is they

13  all dress alike, right?

14  A    It depends.

15  Q    Well, if I was a member of what you call an outlaw

16  motorcycle gang, could I just make up my own cut or would I

17  have to wear the club's?

18  A    The back of the cuts have to be the same.  The front of

19  the cuts are usually -- other than you have to have the one

20  percent on over your heart, other than that, it depends on

21  your rank, your chapter, other things you've earned.  You

22  can kind of design your own front of the cut.

23  Q    Okay.  And as far as is it supposed to be denim, is it

24  supposed to be leather, is there any --

25  A    Choice.

JOSHUA LYONS - CROSS BY MR. ADLER                    72

1   Q    Okay.  And the people in these videos, at least at the

2   Hawg Stop, they're wearing their vests, right?

3   A    There's only -- during the assault and murder there's

4   only two members wearing their cuts.  One of them is Marky

5   Baker and the other one is Ronnie McCabe.

6   Q    And when you identified these people in these videos,

7   is this your own -- are you making this identification

8   yourself or are you asking witnesses --

9   A    Both.

10  Q    -- that were at the scene?

11  A    Both.

12  Q    Okay.  So who were the -- how many witnesses at the

13  scene at the Hawg Stop were interviewed?

14  A    Numerous, sir.

15  Q    How many identified people in the video?

16  A    Numerous.

17  Q    More than ten?

18  A    I don't know about more than ten but I'd say around

19  five.

20  Q    Okay.  And are these people that knew the people in the

21  video?

22  A    Yes, sir.  Well, some knew him or some knew that, okay,

23  I don't know his real name -- like, for example, in the case

24  of Mr. Gomez, I don't know his real name, he goes by "Repo,"

25  he drives a tow truck or whatever.

1   Q    And some of the witnesses identified the shooter as

2   being six-foot-one; do you remember that?

3   A    I don't remember that.

4   Q    Okay.  So you don't recall the discovery that's been

5   provided to us where witnesses identified the shooter being

6   six-foot-one?

7   A    I don't recall who said he was six one or --

8   Q    I'm not asking you who said it.

9   A    -- I don't remember six one.

10  Q    Do you remember, though, that somebody identified the

11  shooter as six one?  That's --

12  A    I don't remember that.

13  Q    Okay.  And you -- are you the lead agent on this case

14  or are you sort of the center of focus of all that?

15  A    Yeah.  In terms of the state, I was not.  That's -- was

16  a Harris County homicide detective.

17       In terms of the federal, it was myself and my partner

18  were I guess co-case agents.

19  Q    You remember there was another witness who identified

20  the shooter being excessively overweight.

21  A    I remember them saying overweight, yes, sir.

22  Q    Okay.  And when you mentioned the state investigation,

23  state (indiscernible), that's the same one we're talking

24  about that's been dismissed now.

25  A    Yes, sir.

1  Q    After four years.

2  A    After how many years, sir?

3  Q    Four.

4  A    Four, yes, sir.

5  Q    Okay.  You said that you surveilled Mr. Gomez while he

6  as on bond for that state case and that you believed he was

7  violating the bond by associating with other Bandido

8  members.

9  A    On his bond conditions it says you can't associate with

10 other gang members.  And he was with them.

11 Q    So you believed he was violating his bond.

12 A    Yes, sir.

13 Q    Who at the state courthouse did you report this bond

14 violation to?

15 A    I did not.  I believe it was reported by another agent.

16 But I don't recall --

17 Q    Okay.

18 A    -- who did.

19 Q    And certainly if you saw Mr. Gomez while he was out on

20 bond engaging in any kind of violent activity, you as a

21 sworn law enforcement officer, I assume you would take

22 action to protect --

23 A    Violence, absolutely.

24 Q    And there was no effort to arrest Mr. Gomez while he

25 was on bond for that murder charge that's now been dismissed

1  over the past four years, correct?

2  A    No, sir.

3  Q    The house that was searched, was that owned by

4  Mr. Gomez?

5  A    I don't believe he owns it.

6  Q    That room you showed the pictures of, there didn't seem

7  to be a bed in that room.  I saw a couple chairs and a TV.

8  Did you see a bed in that room?

9  A    I did not.

10  Q    Okay.  So when you said he stayed in that room, where

11  did he stay in that room with no bed?

12  A    We're going off what his roommate said, he stayed in

13  that room.

14  Q    Okay.  And did you do any investigation as to how

15  credible that roommate is?

16  A    We take him at his word.

17          MR. ADLER:  Okay.  If I could just have a minute,

18  Your Honor?

19          That's all I have, Your Honor.  Thank you.

20          THE WITNESS:  Thank you, sir.

21          THE COURT:  All right.  Yes, Mr. Alston.

22          MR. ALSTON:  Is it okay to (indiscernible)?

23          THE COURT:  Wherever you would like, as long as

24  you've got a microphone close by.

25          MR. ALSTON:  Okay.  Thank you, Your Honor.

1          Officer Lyons, can you see me okay?

2          THE WITNESS:  Yes, sir.

3          MR. ALSTON:  Okay.

4          THE WITNESS:  Trying to move around the computer.

5                    CROSS-EXAMINATION

6     BY MR. ALSTON:

7     Q    You testified that you saw some illegal activities from

8     my client's tattoo shop.

9     A    Which one?

10    Q    Chris Sanchez.

11    A    No, no, I meant which illegal activities.

12    Q    I'm just going back to the first part of your

13    testimony.

14    A    Yes, sir.

15    Q    So my client does have a tattoo shop on Highway 1488.

16    A    Yes, sir.

17    Q    Are you aware how long that's been in business?

18    A    I think when we surveilled it in '22, September, '22 I

19    believe was the date of that surveillance, I believe that's

20    when it opened and it -- he's had it since.

21    Q    So you were doing surveillance on my client and his

22    tattoo shop back in 2022?

23    A    Yes, sir.

24    Q    And were you doing surveillance when that photo was

25    taken, Exhibit 1?

JOSHUA LYONS - CROSS BY MR. ALSTON                    77

1   A    I wasn't there for that but other law enforcement was,

2   yes, sir.

3   Q    Okay.  So that photo was taken by law enforcement.

4   A    Yes, sir.

5   Q    And they knew who they were surveilling, meaning they

6   knew that was Chris Sanchez.

7   A    Yes, sir.

8   Q    And they were aware of his criminal history.

9   A    They were able to look it up, yes, sir.

10  Q    And they're the ones that took the photo of that gun on

11  his hip.

12  A    Yes, sir.

13  Q    And they knew he was a felon.

14  A    They found out, yes, sir.

15  Q    But they didn't arrest him for being a felon in

16  possession of a weapon.

17  A    For officer safety reasons with the number of the

18  public there, I think around a hundred or so, there weren't

19  enough units.

20       And the fear of possibly a gunfight and innocent

21  bystanders, the decision was made that there wasn't a safe

22  option in order to get to him without him possibly drawing

23  it, if that's the decision he decided to make.

24  Q    Okay.  But he didn't live there at his business, did

25  he?

1   A     No, sir, not that we know of.

2   Q     Okay.  So I assume when you were surveilling and you

3   knew his business, you also knew where his home was.

4   A     I don't know what they knew.

5   Q     But they could have arrested him the next day, right,

6   or a week after or a month after?

7   A     I suppose they could have asked for a warrant for that

8   but, again, I didn't -- I wasn't there.

9   Q     And you're a Texas law enforcement officer, correct?

10  A     Certified state peace officer.  Task force officers get

11  a federal deputation.

12  Q     Would you say you're more familiar with state laws or

13  federal laws?

14  A     I try to be a little of both.

15  Q     You said there was marijuana usage there at the

16  Monsters Ink.

17  A     Yes, sir.  That's what was reported to us.

18  Q     Okay.  Was any marijuana seized?

19  A     From that shop, no, sir.

20  Q     I'm not asking you where you live but I assume that you

21  travel around the community here in Houston and Conroe and

22  Montgomery County.

23  A     Yes, sir.

24  Q     Are you aware of the just hundreds of smoke shops all

25  over our city --

1  A     Yes, sir.

2  Q     -- and county?

3  A     Yes, sir.

4  Q     And I assume with your law enforcement background that

5  you're also aware that -- of delta nine, delta eight, and

6  THC-8.

7  A     I -- THC, yes.  I'm not sure about the deltas.

8  Q     Okay.  So you're not -- so you are aware that THC in

9  forms of marijuana are sold in these smoke shops in the

10 State of Texas, and it's legal, correct?

11 A     I've never been in the -- a smoke shop to see.

12 Q     Okay.  Are you aware that marijuana in forms of delta

13 nine and delta eight is sold legally in the State of Texas?

14 A     I've never seen the green leafy substance that

15 Mr. Sanchez has sold out of his shop.

16 Q     If I told you that green leafy buds are sold as delta

17 nine and delta eight, would you have any reason to disagree

18 with me?

19 A     I wouldn't do it because I don't -- because I

20 disrespect you, but I would need to see the law.

21 Q     Okay.  But as a law enforcement officer, are you

22 familiar with delta nine and delta eight being legal forms

23 of THC sold in the State of Texas?

24 A     I don't know, again, what delta eight and delta nine

25 are so I'm not going to testify to that.

1  Q    Okay.  But any of the marijuana that was seen being

2  smoked or was seized in any type of search warrant, it was

3  not tested to determine if it was THC or delta nine or delta

4  eight, was it?

5  A    The marijuana we just got on February 19th has not --

6  we don't have that back from the lab yet.

7  Q    So no one who was investigating Christopher Sanchez at

8  this time back in September 24 of 2022, when a firearm was

9  observed on his hip, thought he was dangerous enough to go

10 to Montgomery County District Attorney's office or Harris

11 County District Attorney's Office and get charges on him for

12 being a felon in possession of a weapon.

13 A    I'm not sure what they thought.

14 Q    Okay.  Did you think he was dangerous enough to go get

15 charges felon in possession of a weapon at that point in

16 time?

17 A    If I were there, yes.

18 Q    But you saw the video, correct?

19 A    Later.

20 Q    How much later?

21 A    I can't recall the date, sir, but it like wasn't that

22 day or any of the days afterwards.

23 Q    But it was one day in 2022.

24 A    I don't even think I saw it in '22.

25 Q    Are you aware what the Texas law penal code 46.04,

 1  unlawful possession of a firearm by a felon?

 2  A    Yes, sir.

 3  Q    And so you're also aware that someone can possess a

 4  firearm if they're a felon at their residence if it's been

 5  five years or longer after their sentence has been

 6  completed.

 7  A    That's what state law says.

 8  Q    Okay.  You are aware of that law.

 9  A    I am, yes, sir.

10  Q    Okay.  And so your testimony today is Christopher

11  Sanchez was seen with a firearm at his -- in his possession

12  on his hip at his residence on September the 24th, 2022.

13  A    He wasn't at his residence.  He was in the parking lot

14  of --

15  Q    I'm sorry.  His --

16  A    -- the Monsters Ink, yes, sir.

17  Q    Yeah, excuse me, I misspoke.  At his business, Monsters

18  Ink, on September 24th, 2022.

19  A    That's what -- yes, sir.

20  Q    I want to direct your attention to February the 2nd,

21  2023, Bimboz Bar.

22  A    February 23rd, sir, I think.

23  Q    Let's just say -- yeah, February 23rd, --

24  A    Yes, sir.

25  Q    -- 2023, Bimboz Bar.

1   A    Yes, sir.

2   Q    Is that in Harris County?

3   A    Yes, sir.

4   Q    Okay.  And that's just -- that's a bar that's open to

5   the public, correct?

6   A    Yes, sir.

7   Q    Okay.  Do you ride a motorcycle?

8   A    I do not.

9   Q    But anybody who rides a motorcycle or just any citizen

10  can go to that bar, right?

11  A    Yes, sir.

12  Q    And you said there was 17 chapters of Bandidos there

13  that day.

14  A    Seventeen chapters had RSVP'd to attend the regional

15  card game.

16  Q    Okay.  How many Bandidos were there?

17  A    I'd say just from the surveillance video and our tower

18  dump and interviews and compiling it, around 70.

19  Q    The surveillance video, is that from a pole cam?

20  A    No, sir.  Just from the surveillance video recovered

21  from Bimboz.

22  Q    Okay.  And how many Gray Beard members were there?

23  A    Fourteen.

24  Q    Did they meet outside or inside of Bimboz?

25  A    Outside.

JOSHUA LYONS - CROSS BY MR. ALSTON                    83

1    Q    Was there anything illegal in and of itself with them

2    meeting there at Bimboz?

3    A    The meeting was not illegal, no, sir.

4    Q    And there was an assault and a fistfight between

5    Bandido members and Gray Beard members.

6    A    There was an assault and fists, but I think other

7    different strikes and blows as well.

8    Q    Okay.  Do you know who started it?

9    A    The Bandidos did, yes, sir.

10   Q    Did you see that from your surveillance?

11   A    Victims.

12   Q    From the victims.

13   A    Yes, sir.

14   Q    But you couldn't see that from the surveillance video.

15   A    From the video, it's hard to tell who, you know,

16   exactly the start point.

17   Q    So the people who your evidence said it was started by

18   the Bandidos is from the Gray Beards motorcycle gang.

19   A    They're not a gang, sir.

20   Q    They're a club?

21   A    Yes, sir.

22   Q    Okay.  But you said that they're support the Bandidos.

23   A    They're not an official support club.  They've been

24   what they call like a friendly club.  There's -- you've got

25   that status of clubs that kind of people know that they go

1    on rides with the Bandidos.

2        Sometimes they'll put on what's called the bar and

3    shield, which is not the support cookie or coaster like

4    support clubs will have.  And the support clubs will have

5    red and gold colors.

6        A friendly club will have their own colors but they

7    just kind of let people know if we had to choose sides, we

8    would choose the Bandidos.

9    Q    Okay.  So they're supporting the Bandidos.

10   A    Yes, sir.

11   Q    So you're taking their -- some -- you have no video

12   evidence of who started this fight, just a witness from the

13   Gray Beards.

14   A    Yes, sir.

15   Q    Okay.  Did that witness have any criminal history?

16   A    I don't believe so.

17   Q    Do you know if it was run?

18   A    Yes, sir.

19   Q    And you said that one of the Gray Beards said that my

20   client, Chris Sanchez, was there.

21   A    Yes, sir.

22   Q    Correct me if I'm wrong, I didn't hear any evidence

23   from your direct where any member of the Gray Beards said

24   that my client, Chris Sanchez, assaulted them; is that

25   correct?

1   A    I don't recall.  But they saw him there in the group

2   right before they were assaulted.

3   Q    Okay.  But before this Court today you have no evidence

4   that any Gray Beard member or any other witness said that my

5   client, Chris Sanchez, assaulted them.

6   A    I would need to read the report, sir.  I'm -- I

7   apologize not having --

8   Q    Okay.

9   A    -- it in front of me.

10  Q    Were there any -- did you testify as to any evidence --

11  were there any evidence of weapons there at Bimboz?

12  A    Weapons?

13  Q    Weapons, guns being pulled on any members of the Gray

14  Beards.

15  A    I don't -- I -- from -- no, sir.  I don't have any --

16  Q    Okay.  So you don't --

17  A    -- that any firearms were pulled.

18  Q    So you don't have any evidence for the Court today that

19  my client, Chris Sanchez, was possessing any weapon that

20  day.

21  A    No evidence he had a weapon there.

22  Q    Okay.  You said that the gray -- a Gray Beard member or

23  members was robbed.

24  A    They all 14 were robbed of their leather vests and

25  cuts.  Various members had different property inside, to

JOSHUA LYONS - CROSS BY MR. ALSTON                86

1  include wallets, cash, credit cards, social security cards,

2  keys, basically the stuff you would put inside of your cut

3  when you're riding.

4  Q    Okay.  So from your testimony today, the Gray Beard

5  Motorcycle Club, they're not gang members.

6  A    No, sir.

7  Q    But from your testimony today, the Bandidos took their

8  motorcycle vests from them.

9  A    Yes, sir.

10 Q    Even though they're not gang members.

11 A    Yes, sir.

12 Q    Do you have any testimony for the Court today that my

13 client, Chris Sanchez, who was among the 70 people there,

14 that he robbed any of these particular Gray Beard members

15 himself?

16 A    I do.  And that's just because you have all the

17 Bandidos members there.  Around the area where the assault

18 and robbery took place, not all 70 are back there.  Maybe

19 between 20 and 30.  So from what the witnesses and

20 surveillance video shows is the people back there were

21 engaged in it.

22      And so one of the last Bandidos we see to leave that

23 are is Mr. Sanchez.

24 Q    Okay.  So could engaged then be he's standing there?

25 A    I suppose.

1  Q    Okay.  So you don't have any actual evidence that my

2  client took a vest from -- or himself off --

3  A    Personally took it off, no, sir.

4  Q    Okay.  And no evidence that he personally hit anyone

5  himself.

6  A    At this time, no, sir.

7  Q    And no evidence that he possessed a gun on that day at

8  Bimboz Bar.

9        THE COURT:  All right.  Let's not keep treading

10  the same ground.  Please move on.

11        MR. ALSTON:  Yes, Your Honor.

12        THE WITNESS:  No, sir.

13        THE COURT:  You -- I'm giving you seven more

14  minutes.  Try moving on.

15  BY MR. ALSTON:

16  Q    In in regards to The Woodlands Harley-Davidson shop, on

17  August 17, 2023 was there -- there's -- none of the assaults

18  were captured on the surveillance from Harley-Davidson,

19  correct?

20  A    It was outside of camera view.

21  Q    Okay.  And as far as the two people that were

22  assaulted, McClare (phonetic) and Williams.

23  A    Yes, sir.  That sounds right.

24  Q    Okay.

25  A    I don't have the report.

1  Q    They were both members of the Wheels of Soul.

2  A    Yes, sir.

3  Q    And they were the ones that were assaulted and robbed.

4  A    Yes, sir.

5  Q    And neither one of them identified my client, Chris

6  Sanchez.

7  A    I don't have their statements in front of me, sir.  I

8  apologize.

9  Q    So you think it was important to review that today.

10 A    I did review it but --

11 Q    Okay.

12 A    -- I like getting the warm and fuzzy by taking a look

13 at the report.

14 Q    So no evidence before the Court that they identified my

15 client as assaulting them or robbing them.

16 A    It wasn't the victims, it was a witness.

17 Q    No evidence that the victims identified my client as

18 assaulting them --

19 A    Not the victims.

20 Q    -- or robbing them.

21 A    Not the victims.

22 Q    And when you say he's pretty identifiable.

23 A    That's how the witness identified him as being real

24 identifiable.

25 Q    That witness didn't identify my client with the gun,

1  did he?

2  A    Yes, he did.

3  Q    Well, from your investigation, didn't you learn that

4  Williams and McClare were the ones that were carrying

5  weapons?

6  A    They also had weapons.

7  Q    And didn't Williams and McClare say -- or didn't

8  Williams say that it was his gun that was pointed at him?

9  A    I think he said he thought it was his weapon pointed at

10 him.

11 Q    So you don't know if first Williams or McClare pointed

12 their guns at anybody, right?

13 A    We have no reason to believe they did.

14 Q    Okay.  The witness, is it just one witness that saw my

15 client?

16 A    Yes, sir.

17 Q    And did you run the criminal history on this witness?

18 A    Yes, sir.

19 Q    Okay.  Did you find anything?

20 A    No, sir.

21 Q    In regards to the search that was done at my client's

22 residence on April 11th, 2024, --

23 A    Yes, sir.

24         MR. ALSTON:  Let me just back up just a second to

25 go back to Exhibit 4, the video at The Woodlands Harley-

JOSHUA LYONS - CROSS BY MR. ALSTON

90

1  Davidson.

2  Q    There's no gun that can be seen on -- my client

3  possessing, correct?

4  A    In the video, no, sir.

5  Q    And there were some traffic stops after that incident

6  at The Woodlands Harley-Davidson.

7  A    Yes, sir.

8  Q    And those were different motorcycle members of the

9  Bandidos other than my client, correct?

10 A    Yes, sir.

11 Q    And the cuts that were taken or the vests that were

12 taken from Williams and McClare were found on those

13 motorcycles, right?

14 A    Yes, sir.

15 Q    And my client was not at those traffic stops.

16 A    No, sir.

17 Q    Do you know if any guns were found at those traffic

18 stops of those other Bandido members?

19 A    Yes, sir.

20 Q    Direct you to the search warrant on April 11th.  Were

21 you there when -- 2024 -- were you there when it was

22 executed?

23 A    I was not at that scene.

24 Q    But you reviewed the reports from that.

25 A    Yes, sir.

JOSHUA LYONS - CROSS BY MR. ALSTON                    91

1   Q    And you testified that there were four guns found.

2   A    Yes, sir.

3   Q    And this was my client's house, right?

4   A    Yes, sir.

5   Q    And this was 2024, it would have been approximately six

6   years, seven years after he was off of any type of criminal

7   sentence, state criminal sentence, correct?

8   A    I would have to look, sir, because I'm not sure if he

9   would have been on parole or like when he flat discharged

10  his time.

11  Q    Okay.  Do you know that those guns were taken from a

12  safe?

13  A    No, sir.

14  Q    Were they or were they not?

15  A    I believe somewhere in the open.

16  Q    Okay.  And you said there was marijuana seeds there.

17  A    I don't recall that.

18  Q    Okay.  Were there any cuts from the Gray Beards or

19  Beast or the Wheels of Soul found?

20  A    No, sir.

21  Q    Okay.  And my client was arrested on May the 10th, 2024

22  in Montgomery County for the Montgomery County case.

23  A    I think he was out of state and then was arrested and

24  extradited.

25  Q    Okay.  But somewhere in May --

1  A    Yes, sir.

2  Q    -- of 2024.

3  A    Yes, sir.

4  Q    Okay.  And that was for the engaging in organized

5  criminal activity.

6  A    From the Harley case, yes, sir.

7  Q    Okay.  It was just the Harley case in this indictment.

8  A    Yes, sir.

9  Q    Okay.  And he made a hundred thousand dollar bond on

10 that case.

11 A    I believe it -- I'm not sure the amount but I know he

12 made bond.

13 Q    Okay.  And did you surveil him like you did Mr. Adler's

14 client while he was on bond?

15 A    I don't remember surveilling Mr. Sanchez up until more

16 recently when we knew -- we were presenting the federal

17 indictment.  So some time had gone by.

18 Q    Okay.  So but he wasn't -- you didn't think he was

19 dangerous enough that you should have surveilled him.

20 A    Well, I didn't say that.  We just have to pool our

21 resources.  There's only so many of us and other cases and

22 other violent --

23 Q    But he -- but you didn't surveil him.

24 A    We did numerous times.  I just don't have the dates.

25 Q    Okay.  And that Montgomery County charge did not

JOSHUA LYONS - CROSS BY MR. ALSTON                    93

1   concern any type of felon in possession of a weapon, did it?

2   A    The engaging?

3   Q    Uh-huh.

4   A    I'm not sure if that was wrapped up in -- it might have

5   just been aggravated robbery or, you know, like engaging

6   with the base aggravated robbery.  I'm not sure if felon in

7   possession was worked in there or not.

8   Q    Okay.

9   A    Or they might have been waiting from the firearms taken

10  from his residence.  I'm not sure if those were filed state

11  or not.  I know they'd sent the firearms off for ballistics

12  and NIBIN and NEXUS, etcetera.  So I'm not sure.

13  Q    And you have no evidence before the Court today that

14  Mr. Sanchez was involved in the shooting that occurred at

15  the Hawg Stop.

16  A    None at all.

17  Q    Okay.  And from the mushrooms and the marijuana that

18  was found in his house on that search warrant, no lab tests

19  have been done on that.

20  A    Not at this time, no, sir.

21  Q    So you can't distinguish if it's legal or -- marijuana

22  or not, right?

23  A    Yes, sir.

24  Q    Okay.  And the mushrooms, are you aware that mushrooms,

25  Lion's mane and certain other mushrooms that look like

1   psilocybin illegal mushrooms, can be bought at smoke shops?

2   A    I am not aware of that, sir.

3   Q    Okay.  But they haven't been tested, correct?

4   A    Not at this time.  They will be.

5             MR. ALSTON:  Could I have just a moment, Your

6   Honor?

7             THE COURT:  Yes, you may.

8   BY MR. ALSTON:

9   Q    Are you aware that -- Detective Lyons, are you aware

10  that my client has lived in the Conroe, Houston area pretty

11  much his whole life?

12  A    I believe so, yes, sir.

13  Q    Okay.  Are you aware that he owns two businesses in the

14  Conroe area, the Monsters Ink and also Monsters Ink Art and

15  Social House?

16  A    I don't' know about the second one.

17  Q    Okay.  Are you aware of him being involved in any

18  nonprofits in the Montgomery County area like Cleanup

19  Conroe?

20  A    I'm not aware of that.

21  Q    Okay.  You're not -- are you aware of him being

22  involved in any Montgomery County overdose prevention

23  endeavors?

24  A    I'm not aware of that.

25  Q    Okay.  Are you aware of him being a member and involved

1  in Bloom and Blaze which helps kids who age out of foster

2  care?

3  A    I want to say I believe he has foster kids.  But I'm

4  not sure what the program you speak of.

5  Q    And you're aware he has five kids.

6  A    I believe that's the number.

7  Q    And three of them may have been adopted through CPS.

8  A    Perhaps.

9          MR. ALSTON:  Okay.  Pass the witness, Your Honor.

10          THE COURT:  All right.  Mr. Robert.

11          MR. ROBERTS:  Thank you, Judge.

12          THE COURT:  That was -- got a timer going.  We're

13  already running into the next hearing.

14          All right.  Go on.

15                    CROSS-EXAMINATION

16  BY MR. ROBERTS:

17  Q    Mr. Lyons, I wanted to ask you some questions about

18  Mr. McCabe.

19  A    Yes, sir.

20  Q    The only two counts that Mr. McCabe is indicted for are

21  two and three, which are specifically related to the

22  incident at the Hawg Stop on September 26th of 2020,

23  correct?

24  A    I believe so, yes, sir.

25  Q    All right.  And from what you testified to earlier is

 1  that he made seven phone calls.  Those phone calls were to

 2  whom?

 3  A    Various Bandidos chapter presidents and other Bandidos

 4  members that were part of the SS Crew.

 5  Q    Okay.  Do you know the contents of those phone calls?

 6  A    Exactly what was said, --

 7  Q    Yes.

 8  A    -- only one of them.

 9  Q    Okay.  And is that because you had a Title Three

10  warrant?

11  A    No, sir.

12  Q    Okay.  And who did that information come from?

13  A    Witnesses that --

14          MR. BLACK:  Yeah.  To the extent this will reveal

15  any -- put anyone in danger, I --

16          THE COURT:  Sustained.  Yeah.

17          MR. ROBERTS:  All right.

18  BY MR. ROBERTS:

19  Q    So the information that you're getting is from somebody

20  who's cooperating.

21  A    Yes, sir.

22  Q    Okay.  And is that somebody who listened to the phone

23  call or received the phone call?

24  A    Received.

25  Q    Okay.  And that was not recorded.

1  A    No, sir.

2  Q    Okay.  So the information that you received from that

3  individual is juts based on that person's word.

4  A    Yes, sir.  And then matched with the totality of the

5  case.

6        MR. ROBERTS:  We'll talk about that in a minute.

7        THE WITNESS:  Yes, sir.

8  BY MR. ROBERTS:

9  Q    But aside from the one person who's cooperating, you

10  are -- you're telling this Court that you believe that their

11  statement is true.

12  A    Yes, sir.

13  Q    And they obviously have a ax to grind in this case, do

14  they not?

15  A    No, sir.

16  Q    If they're cooperating.

17  A    No, sir.

18  Q    Okay.  No reason to protect anybody else.

19  A    No, sir.

20  Q    Or themselves.

21  A    No, sir.

22  Q    Do they have a criminal history?

23  A    Yes, sir.

24  Q    Okay.  Felonies?

25  A    I don't think so.

1    Q    Okay.  Any crimes involving offenses of moral

2    turpitude?

3    A    That's a legal term, sir, you're going to have to help

4    me.

5         (Laughter)

6    Q    Lying, theft, perjury.

7    A    No, sir.

8    Q    Okay.

9    A    No, sir.

10   Q    All right.  Now, you testified that -- to Mr. McCabe's

11   actions at the Hawg Stop that night; were these captured on

12   video?

13   A    Yes, sir.

14   Q    All right.  And that video is available for the Court

15   to see.

16   A    Yes, sir.  Well, I mean, it's in discovery.  I'm not --

17   I don't --

18   Q    All right.

19   A    -- know if it was an exhibit or not but --

20   Q    But it wasn't presented here today.

21   A    The -- I don't remember.  I don't think we saw Hawg

22   Stop video today.

23   Q    Okay.  And you had testified at least previously in

24   Marcel Lett's detention hearing.

25   A    Yes, sir.

JOSHUA LYONS - CROSS BY MR. ROBERTS                    99

1  Q    And you recall that videos from that incident were

2  shown during that hearing.

3  A    I believe there was some video.

4  Q    And there were also screenshots from that.

5  A    The -- there were some screenshots, and then photos

6  from a photographer.

7  Q    All right.  But --

8          THE COURT:  Why are we talking about evidence in

9  another hearing that was not presented today?

10          MR. ROBERTS:  Well, Judge, that's what I'm curious

11  about because --

12          THE COURT:  I don't care about what was in

13  elsewhere.  If it's not here, it doesn't exist for today's

14  hearing.  Please move on.

15          MR. ROBERTS:  All right.

16  BY MR. ROBERTS:

17  Q    Bottom line, Mr. McCabe is not seen in any of those

18  videos that are relevant to the Hawg Stop.

19  A    Not true.

20  Q    Okay.  But they're not presented here today and you

21  didn't identify him here today in any of those videos or

22  screen grabs.

23  A    We didn't see Hawg Stop video today.

24  Q    All right.  And it's up to the Government to present

25  that evidence, is it not?

JOSHUA LYONS - CROSS BY MR. ROBERTS

100

1   A     Not sure who's --

2   Q     Well, who's evidence is it?

3         MR. BLACK:  Your Honor, it's -- I'm going to

4   object.  I don't know how relevant this is.

5         THE COURT:  I sustain.  Government gets to present

6   its case.  This is not a trial.  This is just a --

7         MR. ROBERTS:  All right.

8         THE COURT:  -- detention hearing.  Please move on.

9   BY MR. ROBERTS:

10  Q     You don't have any evidence that Mr. McCabe was armed

11  with a firearm at the Hawg Stop.

12  A     No, sir.

13  Q     You don't have any evidence that he used a firearm at

14  the Hawg Stop.

15  A     No, sir.

16  Q     There's nobody who's identified Mr. McCabe as using a

17  firearm at all at the Fox Stop.

18  A     No, sir.

19  Q     Okay.  And as he sits here today he's not charged with

20  the murder that occurred at the Hawg Stop.

21  A     Not as today, no, sir.

22  Q     Okay.  And that occurred four and a half years ago.

23  A     Round about September 26, 2020.

24  Q     Okay.  And in four and a half years he has not been

25  arrested by state authorities for that incident.

1  A    No, sir.

2  Q    And he hasn't been arrested by federal authorities

3  until two weeks ago.

4  A    Yes, sir.

5  Q    With regard to the firearms that you seized during the

6  search warrant execution, none of the firearms were illegal

7  firearms, were they?

8  A    Illegal to possess in his home, no, sir.

9  Q    Okay.  And when I say that they were illegal, they were

10 not modified into machine guns or anything like that.

11 A    No, sir.  We don't -- we haven't seen that.

12 Q    Oh.  So the firearms were legal and he owned the

13 firearms legally.

14 A    Yes, sir.

15 Q    All right.  And as you sit here today, there's no

16 evidence that any of the firearms that you seized from

17 Mr. McCabe's home were ever used in any crime.

18 A    Not at this time.

19 Q    Okay.  That would be a no.

20 A    Yes, sir.

21 Q    With regard to the body armor, it's not illegal in

22 Texas to own body armor, is it?

23 A    Unless you're a felon.

24 Q    Which he's not.

25 A    No, sir.

1  Q    Okay.  And were you present for the search warrant

2  execution?

3  A    At his house, no, sir.

4  Q    All right.  So would it surprise you that there was

5  only one vest and not two?

6  A    I was told there were two but -- and I'd be happy to

7  admit if I was wrong.  But I would need to look at the

8  search warrant inventory log --

9  Q    All right.

10  A    -- and the photos.

11  Q    But you don't personally know.

12  A    I was told there were two.

13  Q    Okay.  And it's not illegal to own two items of body

14  armor.

15  A    No, sir.

16  Q    Okay.  Were you aware that his wife purchased that for

17  him for their trip to Colombia?

18  A    Purchased what?

19  Q    The body armor.

20  A    I was not.

21  Q    Okay.  You may or may not know the answer to this but

22  have you ever heard that Colombia's a violent place?

23  A    I have seen *Narcos*, yes, sir.

24        MR. ROBERTS:  Okay.  Me, too.

25  Q    Would it be unusual for somebody to buy body armor to

1   protect themselves from being robbed or hijacked in another

2   country?

3   A    I'm surprised they let you come in with it, but --

4           THE COURT:  I am, too.

5           THE WITNESS:  Yeah.

6           MR. ROBERTS:  Okay.

7   BY MR. ROBERTS:

8   Q    But you don't know that they didn't.

9   A    Didn't what?

10  Q    You don't know that they did not allow him into the

11  country with it.

12  A    I didn't know that they got it for Colombia so didn't

13  ask.

14  Q    Okay.  You're also aware that during the search warrant

15  that they seized his passport.

16  A    Yes, sir.

17  Q    Okay.  And with regard to the alleged statement that he

18  was going to flee to Colombia if he were indicted in this

19  case, do you know where that information came from?

20  A    A witness.

21  Q    Okay.  And --

22  A    Source of information.

23  Q    I'm sorry?

24  A    A source of information.

25  Q    All right.  And when did you get this information?

JOSHUA LYONS - CROSS BY MR. ROBERTS

104

1    A    I believe it was later 2020 after we had conducted the

2    enforcement action in November.  We conducted the search

3    warrants on November 10th of 2020, so shortly after that.

4    Q    Okay.  And in the four and a half or five years since

5    you received that information he has not obviously fled to

6    Colombia.

7    A    Hasn't fled there, no, sir.

8    Q    Okay.  Let's talk about the Love's gas station in

9    Baytown.  You said that there were Beast and Bandido members

10   there.

11   A    Yes, sir.

12   Q    There were shots fired.

13   A    We got a report of shots fired.  We were not able to

14   find that on the video.

15   Q    All right.  And you would expect to find shell casings

16   if semiautomatic weapons were used.

17   A    The shots didn't happen right there.  And typically

18   what'll happen in these is because there's too much public,

19   when people leave and egress, the shots will happen further

20   down the road.  We never heard where exactly it happened.

21   We went and looked for casings but we weren't able to find

22   any.

23   Q    All right.  And there's no evidence that Mr. McCabe

24   ever fired a firearm at the Love's gas station in Baytown on

25   May 9th, 2024.

JOSHUA LYONS - CROSS BY MR. ROBERTS                      105

1   A    No evidence that he fired.

2   Q    Okay.  Actually no evidence either that he removed the

3   guns from his person.

4   A    Just the brandish of the hands on them but not that he

5   pulled out.

6   Q    Well, let's make sure we're talking about the same

7   thing.  When you say brandish, that would be to show

8   somebody a firearm, correct?

9   A    Well, you can show a firearm by just raising your shirt

10  and let somebody know, hey, look what I got.

11  Q    But he didn't pull them out.

12  A    I don't have evidence that they cleared his holsters.

13  Q    Okay.  So he didn't pull the guns out.  There's no

14  evidence that he pointed guns at anybody.

15  A    No evidence that he pointed at anybody, no, sir.

16  Q    Okay.  And no evidence that he discharged them.

17  A    No, sir.

18  Q    And he was never arrested for this incident.

19  A    No, sir.

20       (Pause)

21  Q    Again, with regard to the firearms that were seized at

22  his home, you said that they were easily accessible.

23  A    Yes, sir.

24  Q    So they were out in the open, they were not hidden.

25  A    I think some of them were, you know, in the case so

1  maybe those weren't as accessible as a pistol laying, you

2  know, or in a drawer on a dresser, so kind of a variety of

3  how quickly they could be accessed.

4          MR. ROBERTS:  I understand.

5  Q    I guess the question that I'm asking is, these weren't

6  hid in an attic or buried in the backyard or --

7  A    No, sir.

8  Q    -- anything like -- okay.  And in the time since the

9  incident at the Hawg Stop, Mr. McCabe has not been charged

10 or arrested for any other crimes.

11 A    I don't believe so.

12 Q    During the search warrant execution, other than telling

13 agents that he wanted to talk to his lawyer, did he engage

14 in any conduct that placed any of the agents at the scene in

15 danger?

16 A    They weren't aware of what he was doing when he

17 wouldn't comply by opening the door.  So I don't -- after

18 that I'm not sure.  I did not get any reporting of any

19 resistance after that.

20 Q    Okay.  So he complied once they made entry.

21 A    Once they breached, yes, sir.

22         MR. ROBERTS:  Okay.  Pass the witness.

23         THE COURT:  All right.  Okay.  Any -- just for the

24 record, no redirect?

25         MS. ZENON-MATOS:  No, Your Honor.

JOSHUA LYONS - CROSS BY MR. ROBERTS                    107

1              MR. BLACK:  No, Your Honor.

2              THE COURT:  Okay.  Thank you, Officer Lyons.  I

3    know it's been a long morning.  You may step down.

4              THE WITNESS:  Whose was this?

5        (Witness steps down.)

6              THE COURT:  Okay.  Mr. Adler, let's start with

7    Mr. Gomez.  Do you have a proffer or other presentation on

8    Mr. Gomez?

9              MR. ADLER:  I've just got a brief proffer, Your

10   Honor.

11             THE COURT:  Okay.

12             MR. ADLER:  I would proffer the testimony of three

13   witnesses:  Mr. Gomez's mother, Mary, his sister Jeanie

14   (phonetic), and his sister Melissa.

15             I think the particulars of the sisters is probably

16   more important.  His mother's older than me so she's

17   probably not the best surety if the Court was to --

18             THE COURT:  Are you saying that you're old?

19             MR. ADLER:  Unfortunately I am, Your Honor.

20             So his sister Jeanie is 21 years old.  She's

21   employed with the Alvin Independent School District.  She's

22   a U.S. citizen.  She has no priors.  She owns her own home.

23   She's known Mr. Gomez his whole life.

24             She's willing to co-sign on a bond and serve as a

25   custodian if the Court sees fit to impose those conditions

1  for release.

2       His sister Melissa's 44.  She's a U.S. citizen,

3  also has no prior record.  She's a homemaker so she's not

4  employed.  She's also willing to co-sign on a bond and let

5  Mr. Gomez live in her residence (indiscernible) so that is

6  an appropriate surety.

7       I would just point out additionally that the

8  Court's aware but just to make sure, the Pretrial Services

9  Report now has an inaccurate (indiscernible) says there's a

10  pending murder case against him.  That's no longer the case.

11       THE COURT:  All right.  Mr. Alston for

12  Mr. Sanchez.

13       MR. ALSTON:  Yes, Your Honor.  I would just have a

14  proffer for my client.

15       He's 40 years old.  He's a lifetime resident of

16  the Houston area.  His sister is in court today, and so is

17  his wife and two of his children, his older children.  He

18  has five kids.  He's lived in Houston nearly all his life.

19       He has his GED.  He owns two businesses in the

20  Conroe area, Monsters Ink, which is a tattoo shop.  He has

21  nine employees there that are also artists.  That's been

22  recognized in many magazines as the top tattoo place in the

23  Montgomery County area.

24       He also owns Monsters Art and Social House in

25  Conroe, which is a local artist shop where local artists

1  come and display their art.  Also home school kids go there

2  to learn art, display their art.

3          I have 26 character letters if the Court is

4  interested in reviewing those, Your Honor.  They all state

5  that he's a great father to his five kids, that he's a great

6  businessman in Conroe, that he contributes to the community.

7          He's involved in three nonprofits in Conroe.  One

8  of those is called Cleanup Conroe which basically just what

9  the name says, they go clean up areas of Conroe.

10          Another one is called MCOPE, which stands for

11  Montgomery County Overdose Prevention Endeavor, where it's a

12  nonprofit which educates awareness and dangers of fentanyl.

13  They also pass out Narcan, the drug for overdoses.

14          And then his sister is the director of Bloom and

15  Blaze.  She's in court today.  And my client participates in

16  that with his sister.

17          He has three -- he and his wife have adopted three

18  kids from CPS.

19          Bloom and Blaze is a nonprofit where kids who have

20  been in foster care, when they turn 18 and age out of foster

21  care, Bloom and Blaze helps them to find a place to live,

22  learn how to live on their own.

23          He does have a criminal history, Your Honor, which

24  I'm sure you're aware of, which is felon in possession of a

25  weapon.  He was convicted when he was 18 years old.  He's 40

 1  now.

 2         He completed all of his time, paroled, and

 3  everything in 2018.  I know we're in federal court.  But

 4  under state court he could possess weapons at his house.

 5         He did have the assault in 2020.  That -- I would

 6  proffer that he was protecting a family member.  That case

 7  was time served and his sentence was two days in jail.

 8         He was charged with engaging in organized criminal

 9  activity.  And as the agent testified, that is basically

10  this case.  So I anticipate like Mr. Adler's client

11  hopefully it'll be dismissed.

12         I do have for the Court a letter from his bondsman

13  that says he's bonded out on May 10th and he's complied with

14  all -- May 10th, 2024.

15         He has successfully complied with all of our

16  conditions, paid his balances in full per the agreement, and

17  is in good standing with the bonding company.  So he's --

18  the bonding company stays behind him that case.  And that's

19  Exhibit B, Your Honor, if the Court would like to look at

20  that letter.

21         And then Exhibit C, Your Honor, is that my client

22  does have a medical marijuana license.

23         And I would proffer to the Court, Your Honor,

24  there is marijuana that's sold in the smoke shops that looks

25  like marijuana and is sold as legal marijuana.

1          And here are the character letters which are

2   (indiscernible).

3          Your Honor, he does have significant ties to the

4   community.  In the testimony today, the allegations are two

5   assaults, and he's a felon in possession of a weapon.

6          We ask that there are bond conditions that would

7   secure his presence in court, and there are bond conditions

8   that can keep the community safe.  Thank you, Your Honor.

9          MR. ADLER:  Judge, I'm sorry, was I supposed to

10  argue and proffer or just proffer?

11         THE COURT:  Well, I mean, he just sort of went

12  into argument so --

13         MR. ADLER:  Okay.

14         THE COURT:  -- I'm just going to call that his

15  argument.

16         MR. ADLER:  Okay.

17         THE COURT:  No, no, I'll -- okay.  So let's just

18  keep this to a proffer, Mr. Roberts.

19         MR. ROBERTS:  Yes, Your Honor.  I was -- there

20  were seven individuals whose names I was provided who are

21  willing to testify on behalf of Mr. McCabe, notably of

22  course his sister and his mother.

23         But one retired police officer, one current police

24  officer who -- well, one given his position can't testify in

25  court but would be in support of Mr. McCabe and Mr. McCabe

1  being released on bond.

2          And I'd just like to also point out with regard to

3  -- well, I'll cover that in argument, Your Honor.  But those

4  are the individuals who, if called to testify, would be

5  here.

6          His wife is here.  She has been at every hearing.

7  She has been in constant contact with me.  And she is

8  willing to act as a third party custodian if the Court

9  grants release.

10          THE COURT:  All right.  So, Ms. Zenon or

11  Mr. Black, let's get to argument.

12          MS. ZENON-MATOS:  Yes, Your Honor.  I'm going to

13  address Mr. Sanchez and then (indiscernible), Your Honor.

14          As the Court is aware, as to Mr. Sanchez, it's a

15  presumption case.  Obviously the statute obliged the

16  Defendants to produce conflicting evidence as to danger to

17  the community and risk of flight from the proffers.

18          And, Your Honor, we did not receive any of the

19  documents in order to examine them.  But I know they were

20  presented to the Court that they were proffered by counsel.

21          Even based on his statements, we do not believe

22  that that is sufficient to counter the --

23       (Alarm ringing.)

24          THE COURT:  I'm sorry.

25          MS. ZENON-MATOS:  -- presumption in this

1  particular case, Your Honor.

2          Even beyond that, even if the presumption would

3  have been rebutted, that we believe (indiscernible) this

4  case not be (indiscernible) this proffer.

5          (Indiscernible) to rebut the presumption.  We do

6  believe that the 3142(g) factors still favor detention in

7  this case, as do the nature and circumstances of the

8  offense, Your Honor.

9          As Officer Lyons testified, this particular

10 defendant was the second highest ranked individual.  He was

11 the vice president of the local chapter.

12         We have this individual present, for example, at

13 the Bimboz assault.

14         This was an individual with a leadership role.

15 And we have no evidence that at any point this individual,

16 who was not in the outside areas, who was not just observing

17 in the outside, e was present in the particular area in

18 Bimboz where the attack occurred.

19         And we have no evidence that this individual that

20 had a leadership role at any time prevented this assault and

21 attack on this other individuals from taking place.

22         In addition to that, we have this individual in

23 the possession of a firearm, as identified by a witness,

24 assaulting in the Harley-Davidson store of other individuals

25 and essentially threatened those individuals.

114

1        And we know again that this is not a pub, this is

2   not a Bandidos place.  This is a store.  And this happened

3   in broad daylight.  This is a store open to the public.

4        And this individual, who was a convicted felon at

5   the time, prohibited by federal law, notwithstanding what

6   the state law says, was prohibited by federal law from

7   possessing a firearm, we have this individual assaulting

8   another person in the possession of an illegal firearm in

9   broad daylight, Your Honor.

10        We believe that this factors weigh in favor of

11   detention.

12        As to the weight of the evidence, Your Honor, the

13   testimony of Agent Lyon proves that the evidence in this

14   case is very solid as to this defendant.  We have him with

15   the video at Bimboz.  We have witnesses and a video

16   essentially proving the assault with a firearm at Harley-

17   Davidson.

18        We have the execution of a legal state warrant at

19   his residence in April 2024.  And obviously more recently an

20   additional (indiscernible) at his residence.

21        The weight of the evidence in this case is

22   substantial.  We believe that those factors favor detention.

23        As to this history and characteristics, Your

24   Honor, this defendant, as detailed in the Pretrial Services

25   Report, was convicted in 2003 of a crime of violence,

1    assault with a deadly weapon.

2            He committed another felony while in prison.

3            Even though it's not a felony in 2020, we have him

4    again assault of a family member notwithstanding his excuse

5    as to why he assaulted somebody.

6            The history of this individual, including his

7    participation in violent acts while he was a Bandido member,

8    only demonstrates that he has no respect for the law.  We

9    believe that that -- those factors weigh in favor of

10   detention.

11           Your Honor, this individual had firearms in 2024

12   when the state executed a warrant.  You would think that

13   this individual had suspected they might get me in a few

14   days, they seized my weapons.

15           What happened just a few days ago?  We found him

16   again in possession of a shotgun.  That again proves, Your

17   Honor, that this individual has no respect for the law.

18           And that also goes, Your Honor, as to risk of

19   flight.  How is the Court going to trust that this

20   individual is going to abide by any conditions when this

21   individual while in prison violated the law, while he was on

22   bond since May 2024, and we just found him a few days ago

23   with a shotgun?

24            How is the Court going to trust that this

25   individual is going to be abiding by conditions when

1    apparently he cannot stop violating the law and apparently

2    he does not care?

3           And as to the marijuana, Your Honor, we presented

4    the statute.  And obviously we have not received the

5    results.

6           But the statute is clear.  You can have a medical

7    marijuana license.  You cannot be smoking marijuana because

8    that is not part of the products that can be sold under a

9    medical marijuana license.

10          So what we have is evidence that Defendant was

11   smoking what appeared to be marijuana.  That's what we have.

12          Again, he was granted the opportunity to have a

13   license.  And based on what we observed from what was

14   seized, the Defendant was in possession of marijuana.

15          Your Honor, this is a defendant that, according to

16   the Pretrial Services Report, has serious mental problems.

17   We have drug use.  We have serious mental problems.  We have

18   continuous possession of firearms.  That is a lethal

19   combination.

20          This is the individual that comes here to try to

21   convince the Court that he's not a danger to the community.

22   And United States (indiscernible) through 73 -- I stand

23   corrected -- at 2799 from the Fifth Circuit, it says, the

24   likelihood that defendant will continue to commit crimes

25   makes him a danger to the community.

1        We believe that that applies to this case, Your

2    Honor.  And that is a conclusion that the Court needs to

3    reach.

4        There is ample evidence, clear and convincing

5    evidence that the Defendant cannot stop committing crime.

6        There is clarity in this case the Defendant is a

7    danger to the community and he cannot be trusted to appear.

8        Notwithstanding what the bond report says, it is

9    clear that he has continued to violate the law.  And,

10   therefore, we believe that he should be detained pending

11   trial.  Thank you, Your Honor.

12        THE COURT:  Okay.

13        MR. BLACK:  Your Honor, I'll address Mr. Gomez and

14   Mr. McCabe here.  Again, these are both presumptions based

15   upon the 924(c) charge.

16        The Government's chief concern in both is public

17   safety.  However, there is a heightened flight risk concern

18   with respect to Mr. McCabe.

19        As far as both of them, I'll just state at the

20   outset public safety concern in large part, apart from their

21   history, comes from the fact that both are current members

22   associated -- or associates of the Bandidos.  They're

23   engaged in an ongoing war with Beast.

24        As you heard from TFO Lyons, they are expected to

25   engage in violence with Beast if they are in the community.

1  And they are accused of having done so on behalf of the gang

2  in the past.  So that applies to both of them.

3      With respect to Mr. Gomez, the Court heard the

4  evidence.  He is identified as the shooter in what the

5  Government views is a murder of a victim during an assault

6  at the Hawg Stop back in September, 2020.

7      Obviously very serious, gravely dangerous criminal

8  conduct perpetrated on behalf of a criminal organization.

9      Mr. Gomez's association with that criminal

10 enterprise continues to the present.  Worse still in an

11 aggravating matters there is this allegation from earlier in

12 February of this year of potentially assault with a firearm

13 in connection with towing.

14      And then worse still, while he is on bond for a

15 murder charge, his room is -- it's a cornucopia of firearms.

16 It is deeply, deeply troubling.

17      I cannot overstate the extent to which that

18 represents a grave danger to public safety for someone who

19 is a member of a rival gang.

20      So I'm not going to march through his criminal

21 history.  It is lengthy.  It goes back to 1995.  This

22 gentleman cannot be in the community.  He has been violating

23 his conditions of bond release.  There are no conditions

24 this Court could set.

25      With respect to Mr. McCabe, there are the public

1  safety concerns for him as well based upon the conduct the

2  Court heard described during TFO Lyons's testimony that goes

3  back a ways, as the Court heard, to 2020.  But it continues

4  through fairly recently.

5          He remains a member of the organization.  In May

6  of 2024, he's involved in this encounter between Beast and

7  Bandidos at the Love's truck stop, showing that not only is

8  he a part of the organization still, he is still engaged in

9  doing their violent, dirty work, or at least part of that

10  activity that's going on.

11          Possesses numerous firearms.  I understand he can

12  lawfully possess them.  But firearms, body armor, history of

13  engaging in violence for the organization, this is all a

14  recipe for danger to public safety.

15          Court also heard that he does have sound like

16  previous travel to Colombia.  I think that's noted in the

17  Pretrial Services Report as well as during TFO Lyons's

18  testimony.

19          And then you heard from TFO Lyons that he

20  expressed that if he is charged for what happened at Hawg

21  Stop, he intends to flee to Colombia.

22          This is not some sort of theoretical thing he

23  might do that he has no connection to.  He has been there.

24  His wife is from there.  It is a very real concern.

25          Mr. McCabe does have some criminal history.  It's

1    not the most serious.  But he has had prior encounters with

2    the law that have been insufficient to turn him from

3    reengaging with criminal activity.

4         And so based upon everything in the Pretrial

5    Services Report and the testimony that the Court heard

6    today, there are no conditions that the Court can set for

7    him either that would reasonably ensure both his appearance

8    and public safety.  Thank you.

9         THE COURT:  All right.  Mr. Adler, you want to

10   give me a short summation for Mr. Gomez?

11        MR. ADLER:  Yes, Judge.  I think the argument that

12   my client is a danger to the community would have a lot more

13   strength if he hasn't been out in the community for the past

14   four and a half years.

15        There's really been no explanation as to how the

16   Government can even argue that he's a danger to the

17   community if he's been on bond for four and a half years,

18   making all his court appearance.

19        He's a lifelong resident of this area.

20        Yes, he has criminal history, no doubt.  The

21   upside of that is as the agent testified, there's no

22   evidence he's ever missed a court date.

23        And his most recent conviction was over eight

24   years ago for a misdemeanor.  Three days was the punishment.

25        As the Court knows, the murder case has been

1  dismissed.  But while that case was pending, there was no

2  evidence presented to this Court that Mr. Gomez violated or

3  engaged in any criminal activity.  He was not charged with

4  anything.

5          There is this allegation of this towing incident.

6  It seems awfully vague and ambiguous that no idea who these

7  people are or no corroborating evidence.

8          Obviously they're not happy their car's being

9  towed so it's very easy to say that the guy pulled the guns.

10          As far as his house, the Court is really bereft of

11  evidence that it's actually Mr. Gomez's house.  There was

12  nothing found in that house that had his name on it.

13          The room that they claimed he lived in didn't even

14  have a bed.  There were some chairs.

15          You have no identifying information on the

16  "occupant" of that house, or the roommate.

17          There's materials in the garage.  All of these --

18  the guns, there's no fingerprints evidence before the Court.

19          You know, I understand the Court may have some

20  very serious concerns about the allegations the Government's

21  made.  But obviously the Court can't make these decisions

22  without evidence to back it up.

23          I think the Court can impose conditions of release

24  just like the Harris County -- your colleague in Harris

25  County did four and a half years ago on a more serious

1    charge.

2            He's not charged with murder here.  We haven't

3    seen the video where they -- in any of the detention

4    hearings we haven't seen the video that they claim shows him

5    engaging in the murder.

6            So I think the Court can set conditions of

7    release, you know, home confinement, lock him up in his

8    sister's house.  She's a homemaker.  She'll be there all day

9    long.  Make her custodian.

10           If he leaves the house without permission, I

11   promise you she will call the Marshals about it.

12           Lastly, Judge, I just want to point out what

13   sometimes might seem a small issue, but some of your

14   colleagues here view it as a big issue, and that is there's

15   no evidence linking the testimony here today to this man

16   sitting next to me.

17           They identified Mr. Alston's client.  They did not

18   identify Mr. Gomez.  There's no testimony presented to the

19   Court that all of this investigation that went on was this

20   man here in the court.

21           It would have been a very simple thing to ask, is

22   that Mr. Gomez sitting at the table, the one you

23   investigated.  But it wasn't done, Judge.  It's just a

24   failure on the Government's part.

25           So I think that also goes to the weight of the

1    evidence and the Court's consideration of whether he can be

2    re-released on bond after this four and a half year term of

3    prior bond.

4           THE COURT:  All right.  Mr. Alston, you kind of

5    gave part of summation already so I'm going to limit you to

6    a couple minutes.

7           MR. ALSTON:  Yes, Your Honor.  I apologize for

8    that, just trying to move quickly.

9           Your Honor, there are conditions.  His wife is

10   here.  She's been to every court hearing.

11          We've heard some of the defendants that have been

12   charged (indiscernible).  He has five kids, he has

13   sufficient ties to the community.  He has two businesses.

14          His wife doesn't have any criminal history and is

15   willing to sign on the bond conditions.

16          Like Mr. Adler said, he could be confined to his

17   home.  He can take care of his kids, he can provide for his

18   family by running his two businesses.

19          And I would ask the Court to set a bond and set

20   conditions, Your Honor.  Thank you.

21          THE COURT:  Mr. Robert.

22          MR. ROBERTS:  Your Honor, Mr. McCabe is charged

23   with two counts of an offense that allegedly occurred in

24   September 26 of 2020.

25          In that period of time, Lieutenant Lyons has

1  testified that since that incident, Mr. McCabe has not been

2  charged with a crime.  He hasn't been arrested for any

3  offense.

4          And if the Government were as concerned as they

5  say they are about the safety of the community, they

6  certainly let somebody they believe is dangerous roam the

7  streets for near five years.

8          One would think that they certainly would have

9  moved much more quickly if they were concerned about the

10  safety of the community.

11          There was much ado about the firearms that were

12  found in his home.  This is Texas.  We do like firearms

13  here.  And it is not unlawful for Mr. McCabe, as Lieutenant

14  Lyons testified, for him to own the firearms that he owned.

15          None of the firearms were modified or illegal in

16  nature.  And he legally owned them as he did the body armor.

17  He was entitled to do that.  There's nothing unlawful about

18  it.

19          Lieutenant Lyons speculated on why and gave some

20  examples of he's -- as to why that's concerning.  Although

21  he has no specific examples or testimony to give that

22  Mr. McCabe used the body armor or any of the firearms at any

23  illegal activity.

24          With regard to his ability to flee, one, aside

25  from needing a passport to flee, which the Government has

 1   confiscated, you also need financial means.

 2         And as the Court is aware, I was appointed to

 3   represent Mr. McCabe because he does not have the financial

 4   resources that would be necessary for him to run.

 5         Also, this is an unattributed statement that was

 6   made four and a half or five years ago, according to

 7   Lieutenant Lyons.  And the veracity of that comment is

 8   questionable at best.

 9         His wife has been here at -- she's been here for

10   every setting.  She has been in continuous contact with me.

11   There is no reason to believe that, again, given all the

12   factors that Mr. McCabe would be a danger to society or that

13   he would fail to appear as ordered in this court.

14         There's been no evidence to suggest that he would

15   not appear, other than some distant statement about fleeing

16   to Colombia.

17         There are factors that the Court can consider and

18   conditions that the Court can order to ensure that

19   Mr. McCabe appears as required and also ensure the safety of

20   the community.  Thank you, Judge.

21      (Pause)

22         THE COURT:  All right.  As to each of you, in

23   considering the Government's -- to detain each of you

24   pending trial, I'm governed by several principles.

25         First, each of you is entitled to the presumption

1  of innocence.  That means that nothing that's happened in

2  today's hearing or anything I might say in my findings will

3  affect that presumption.

4       Instead, the purpose of the hearing is to

5  determine whether, notwithstanding that presumption, you

6  should be detained until trial.

7       Second, under The Bail Reform Act, pretrial

8  detention is an exceptional step.  Under the Act, a

9  defendant must be released before trial unless I find that

10 there's no condition or combination of conditions that will

11 reasonably assure the defendant's appearance in the case or

12 reasonably assure the safety of any other person or the

13 community.

14      And the Act also requires that the least

15 restrictive conditions be imposed that are necessary to

16 provide those assurances.

17      If, however, I cannot find any conditions that

18 will reasonably assure your appearance in the case or

19 reasonably assure the safety of any other person or the

20 community, then the Act does require that I order you be

21 held in custody.

22      As to each of you, due to the nature of the

23 charges against you all, there is a presumption favoring

24 your detention pending trial.

25      And I find that each of you has rebutted the

1    presumption of -- that you -- that your release would pose a

2    risk of nonappearance.

3          But I'm going to address the risk of danger to the

4    community separately as to each of you.

5          First, Mr. Gomez, of these cases, you are charged

6    with one of the most serious offenses, namely involvement in

7    a assault that resulted -- and shooting that resulted in the

8    death -- I'm sorry.  No.  yes, assault resulted in the death

9    of the victim of a rival gang member.

10          I also take into account the fact that you have a

11   series, a long and unfortunate history of committing violent

12   offenses.  And that is a significant factor that weighs in

13   the Court's consideration.

14          Moreover, it appears that you also violated the

15   conditions of release even while the state murder charges

16   were pending by again possessing firearms.

17          And as a convicted felon, notwithstanding the fact

18   that you were already on bond, you are not allowed to

19   possess any firearms.

20          And given your active involvement as a Bandidos

21   member, involvement in the charged offenses of which the

22   Government has presented substantial evidence, I have no

23   confidence that you would abide by any conditions of release

24   that I can pose to ensure that you would not pose a danger

25   to the community if you were to be released.

1    And so for those and other reasons detailed in my

2    written order, I'm ordering you be detained until trial.

3    As for Mr. Sanchez, the Government has presented

4    substantial evidence that you were at least involved in two

5    assaults on behalf of the Bandidos Outlaw Motorcycle Gang,

6    including a beating a member of Gray Beards rival gang

7    members at the Bimboz Bar in February, 2023.

8    And also pulling a gun in a public place to --

9    when confronting a rival gang member at a Harley-Davidson

10   location in August of 2023.

11   And this, coupled with your background of having

12   prior violent offenses, raises serious concerns about the

13   public safety if you were to remain on release.

14   Moreover, your prior felony conviction prevented

15   you from possessing any firearms.  And yet when the

16   Government conducted a search of your residence, found

17   multiple firearms in your possession, which you were

18   forbidden from having.

19   And the possession of firearms in the hands of a

20   convicted felon, particularly one with prior violent felony

21   convictions, much less one who is still actively involved in

22   a violent outlaw motorcycle gang, underscores the danger

23   that your release would pose to the community.

24   And so for that reason I'm ordering that you be

25   detained pending trial.

1          Okay.  As for Mr. McCabe, okay, the Government has

2    argued both that your release would pose a danger of

3    nonappearance as well as risk of danger to the community.

4          I recognize that you are -- that the Government

5    found quite a number of possessions and of -- found you in

6    possession of quite a number of firearms, as well as body

7    armor.  But your criminal history did not preclude you from

8    possessing those items.

9          Nevertheless, Government also presented evidence

10   that you have used those weapons, at least shown them, in

11   order to menace rival gang members at least on one occasion,

12   at a Harley-Davidson location.

13         MR. ROBERTS:  I'm sorry, Judge.

14         THE COURT:  No, I'm sorry, I'm mixing them up.

15         MR. BLACK:  The Love's location.

16         THE COURT:  That was the -- I'm sorry, the Love's

17   location, yes.  The Love's location as the Government

18   demonstrated through screenshots of videos or photographs

19   that were provided.

20         Moreover, the proposal to remain with your wife is

21   not an adequate assurance because the Government presented

22   evidence showing that your wife is essentially, you know,

23   associated with the Bandidos gang.

24         There is paraphernalia, you know, that she herself

25   carries as a member or affiliate of a Bandidos gang member.

1  So she's clearly aware of and has done nothing to prevent

2  you from engaging in this criminal enterprise.

3          I am less convinced that your release would pose a

4  significant risk of nonappearance.  There is this assertion

5  that you would flee to Colombia if you were indicted.

6          But seems that the statement was made quite some

7  time ago.  And despite being clearly aware of events leading

8  up to your arrest and this indictment, you have still

9  remained here.

10          Nevertheless, your active participation in the

11  Bandidos, which you are still involved with, your wife's

12  awareness and association with the Bandidos gang, the

13  incidents involving, you know, wielding or carrying firearms

14  as part of the Bandidos enterprise, all -- they give me --

15  lead to the conclusion that there's clear and convincing

16  evidence that your release would pose a risk of danger to

17  the community, especially given your willingness to do

18  violence and to do harm to rival gang members.

19          So for that reason I'm also ordering you be

20  detained pending trial.

21          All right.  Have we already had arraignment, do

22  you know?

23          MS. ZENON-MATOS:  Yes.

24          MR. SPEAKER:  Yes, Your Honor.

25          MR. SPEAKER:  We have.

1          THE COURT:  Okay.  All right.  Anything else that

2   we can do for Messrs. Gomez, Sanchez, and McCabe?

3          MR. SPEAKER:  No, Your Honor.

4          MS. SPEAKER:  No, Your Honor, thank you.

5          THE COURT:  All right.  Thank you.

6          Then you're excused.

7       (Proceeding adjourned at 11:23 a.m.)

8                    *  *  *  *  *

9          *I certify that the foregoing is a correct*

10  *transcript to the best of my ability produced from the poor*

11  *quality of the electronic sound recording of the proceedings*

12  *in the above-entitled matter.*

13  */S/ MARY D. HENRY*

14  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

16  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17  *JTT TRANSCRIPT #69689*

18  *DATE FILED:  APRIL 24, 2025*

19

20

21

22

23

24

25